[Crim. No. 4741. In Bank. Dec. 18, 1946.]

THE PEOPLE, Respondent, v. DANTE MANCHETTI, Appellant.

Nathan C. Coghlan for Appellant.

Robert W. Kenny, Attorney General, David K. Lener, Deputy Attorney General, Edmund G. Brown, District Attorney, and Charles S. Peery, Deputy District Attorney, for Respondent.

SCHAUER, J.—A jury found defendant guilty of robbery in the first degree committed while defendant was armed with a pistol. Defendant appeals from the judgment entered pursuant to the jury verdict and from an order denying his motion for a new trial. There is evidence to support the verdict, but the testimony of the prosecuting witness, victim of the asserted robbery, is, to say the least, unusual, and the evidence as to whether the crime was committed and also as to the credibility of the important witnesses is in sharp conflict. The trial was conducted in an atmosphere of bitter animosity among those witnesses who were members of the family of the prosecuting witness. In the circumstances certain errors complained of by defendant may well have influenced the verdict of the jury; certainly we cannot say that they did not have such effect. Therefore, fairness to defendant requires a new trial. (*People* v. *Kane* (1946), 27 Cal.2d 693, 702 [166 P.2d 285], and cases there cited.)

Defendant was convicted of robbing Rose Pesce on November 13 and 14, 1940. The testimony of Rose covers various incidents, including many asserted public offenses of defendant against the person and property of Rose, from 1929,

when she first met defendant, until May, 1944 (a year prior to the trial of this action), when he "told me . . . go up to his attorney's office and have all this squashed, and I said, 'No.'" Such testimony is as follows: From time to time after Rose met defendant in 1929, they lived together as man and wife. At a time which does not appear, Rose became the operator of a house of prostitution. In 1939 "I got several beatings, very severe beatings" from defendant and on three occasions he obtained money from Rose by threats. "He says I was quite successful and I made a good deal of money, and he'd taught me everything I knew, and he was entitled to it because he taught me."

Rose further testified that on November 13, 1940, at about 11 a. m., defendant and one Pelozzari came to Rose's establishment in Benicia. Defendant demanded $1,500. Rose refused to give defendant money "and he pulled out a gun and slapped me [with the gun]." Pelozzari also produced a gun. Persons who lived and worked in the house came and went. Defendant repeated his demands and threats. About 10 p. m. Rose "finally couldn't stand it any longer, and I called my maid, and I said, 'Go see how much I have and give it to them.'" The maid handed defendant $500. Defendant and Pelozzari "said they were going to stay there until I gave them the rest of the money." Defendant, with Pelozzari, remained all night, reiterating his demands and threats. Twice during the night a private night watchman knocked at the door of Rose's establishment, as was his custom and duty; Rose or her maid came to the door and told him that "things were all right." Rose had a telephone and, as stated, other persons were in the house. But Rose did not summon aid because defendant threatened "to get my whole family. . . . He was going to run over my little niece and get my husband and beat them up." The next day (November 14, 1940) Rose, still in fear of bodily harm or death, drove to San Francisco in her car with Pelozzari, who kept his hand on his gun; defendant followed in his car. They went to a bank where Rose had a safe deposit box. Defendant accompanied her to the box. She took out $1,000 and handed it to defendant. Rose made no complaint to any employe of the bank because "If I had said anything they'd only come back and get me." She returned to her establishment and notified the parole board of the above events (defendant was on parole) but did not notify the police.

Rose testified that she next saw defendant "[a]round

Christmas time'' and that she did not see him again until July 4, 1941, when he came to her home armed with a gun and said, ''Now, I'm off parole, . . . and from now on I'm boss; you'll do what I want. . . . You can't turn me in to the Parole Board any more.'' On July 8, 1941, defendant forced Rose, who was in fear of her life, to go to her bank in Berkeley and withdraw $1,200. With this money defendant bought an automobile. At about this time he beat her severely. She complained to the Berkeley police but ''Nothing was done because he took me out of the state,'' on a trip across the country in the new car. Defendant ''said he'd talked it over with his attorney, and that's the only way out, he'd have to take me out of the State so I couldn't testify on the other things he'd done to me.'' Rose further testified, '' [I] didn't know I was going East. I was knocked unconscious and I didn't come to until I came to in Salt Lake City.'' (But Rose also testified that before leaving for the East she took her dog to her sister-in-law to be cared for during her absence; she made no complaint of defendant's conduct to the sister-in-law ''because we never got along.'') Defendant and Rose stopped in various cities and visited relatives of Rose in Boston. They were absent from the state for about a month. An aunt of Rose returned with them to California. Throughout this time Rose, because of fear for the safety of her husband, made no complaint of defendant's conduct, except that she once telephoned to her uncle in Oakland concerning her predicament; the uncle did nothing about the situation.

The testimony of defendant and others is directly at variance with all salient portions of the above testimony of Rose, both as to the offense charged and as to subsequent conduct of defendant which, according to Rose, caused the delay in making complaint of that offense. Rose's maid corroborated her testimony as to the events of November 13, 1940. Rose's sister and sister-in-law testified that the maid did not live or work at the establishment on November 13 and 14, 1940; that they were employed there, doing housework, and were present on those dates; and that they did not see defendant, Pelozzari, or any men with guns. Rose's brother testified that his wife (the above mentioned sister-in-law) had never worked for Rose. The evidence as to other matters is similarly conflicting. For example, according to the testimony of defendant (and as corroborated by a San Francisco police officer), after defendant and Rose returned from their trip across the country in Sep-

tember, 1941, defendant learned that the Berkeley police, although they did not have a warrant, "would like to talk to Dante Manchetti." Defendant went to Berkeley and talked with the police and the district attorney concerning Rose's accusation "that I forced her at the point of a gun to go into a bank and draw out $1200 in Oakland to buy out the car . . . [The police, the district attorney, and the salesman who sold defendant the car] had a discussion, and he [the district attorney] started to laugh, and he said, 'You'd better go home.' . . . and that's the last I heard of that." Thereafter, defendant testified, Rose "kept telling me all the time, 'I'll frame you if it's the last thing I do.' "

In the latter part of 1941, defendant left California. On December 15, 1941, defendant and Pelozzari were accused by indictment of robbing and kidnapping Rose on or about November 14, 1940. (Pelozzari appeared, was arraigned, and after seven continuances was released on his own recognizance on December 17, 1942. The disposition of the cause against Pelozzari does not appear.) In May, 1944, federal authorities brought defendant to California. According to defendant he then learned for the first time of the present charge. After sixteen continuances (one, at defendant's request, to plead; eight of the court's own motion; six by consent; one at the request of the People) trial commenced on May 24, 1945. On that day, on motion of the district attorney, the charge of kidnapping was dismissed.

Defendant first contends that he was, in substantial effect, arbitrarily deprived of the right to "appear and defend . . . with counsel" (Cal. Const., art. I, § 13) and, as a part of such contention, urges in particular that he was so deprived of the right to be represented by counsel of his choice. Relative to the mentioned contention the record shows the following: On April 24, 1945, the cause was continued for trial to May 23, 1945. On May 8, 1945, a case in the Superior Court of San Mateo County in which defendant's counsel, Mr. Coghlan, was appearing was continued to May 22. On Saturday, May 19, Mr. Dunning, a deputy district attorney, advised Mr. Coghlan that the present cause "was definitely going to proceed." Mr. Coghlan said that he could not go to trial on the 23d. On Monday, May 21, Mr. Coghlan and Mr. Dunning appeared before the presiding judge. Mr. Dunning stated that the People had "subpoenaed foreign witnesses who are presently within the jurisdiction of the city, and ready for

trial," and, therefore, would not consent to a continuance. The presiding judge advised Mr. Dunning to telephone the San Mateo judge on behalf of Mr. Coghlan, explain the situation, and request a continuance of that matter. Such continuance was refused. On May 23, Mr. Dunning and defendant, unrepresented, appeared before the trial court. Mr. Dunning explained Mr. Coghlan's situation and stated that foreign witnesses for the People, "one from out of the State, and another from Los Angeles," were present; that because of the condition of the department calendar he had not called a jury for that day but had called one for the 24th. On May 24, Mr. Andrews, an attorney, appeared *for Mr. Coghlan*, again explained Mr. Coghlan's absence, said he was totally unfamiliar with defendant's case, and moved for a continuance. Mr. Elkington, deputy district attorney, opposed the motion. He said that defendant "became a fugitive" (a reasonable inference, although, as stated, defendant testified that he did not know of this charge when he left California) ; that "The District Attorney [after defendant's arraignment] had tried and tried to bring this case to trial" (an assertion not otherwise borne out by the record) ; and that "We have witnesses who have come from Los Angeles." (No witnesses from Los Angeles or from out of the state testified and there is no explanation by the People of the repeated assertions that such witnesses had been subpoenaed and were present.) A continuance was refused. The trial court said, "We will proceed with the selection of a jury, and then . . . the Court will take a reasonable recess to enable you to familiarize yourself with the facts of the case."[1] Defendant asked, "May I say something?" and the court replied, "No, you just sit down and follow the advice of your lawyer." A jury was selected and an adjournment taken to Friday, May 25. On May 25, Mr. Andrews expressly and defendant impliedly indicated their objections to Mr. Andrews' representing defendant but the court ordered Mr. Andrews to proceed with the trial and

---

[1]Defendant argues at some length that Mr. Andrews, concededly an able attorney, could not adequately examine prospective jurors when, as he informed the court, he had not had opportunity even to learn "specifically what the charges are." Defendant is correct in his assertions that knowledge of the background of a case is important in selecting a jury. But he has not attempted to show, otherwise than by inference from the basic facts, that he was prejudiced in this respect. At his request the record on appeal does not include a transcript of the voir dire examination.

the order was obeyed. On Monday, May 28, Mr. Coghlan appeared, was substituted for Mr. Andrews, and the case was continued to Thursday, May 31, because the trial judge was ill. During the remaining four days of trial defendant was represented by Mr. Coghlan, the attorney of his choice.

The refusal of Mr. Andrews' request for a continuance in itself was not a denial of defendant's right to be represented by counsel of his choice for defendant had no absolute right to be represented by a particular attorney. It is clear, as the People urge and as this court stated in *People* v. *Dowell* (1928), 204 Cal. 109, 113 [266 P. 807], "that the courts cannot in every case await the convenience of some attorney before they can function. Reduced to its lowest terms this would allow a popular attorney to have the courts marking time to serve his convenience." On the other hand, not only the convenience of court and prosecution but also the rights of persons accused of crime must be considered. The trial court should exercise care not to handicap to his prejudice a defendant who is not responsible for the fact that his counsel is engaged in trial of another case. (See Fricke, Criminal Procedure (1945), pp. 193-194.) Where this court has upheld the denial of a motion for continuance made on the ground that the attorney of defendant's choice was engaged in another trial, it has been careful to point out that defendant was given adequate opportunity to obtain other counsel. (*People* v. *Goldenson* (1888), 76 Cal. 328, 341 [19 P. 161], where the case was continued for five days to allow new counsel appointed by the court to prepare the defense; disapproved on other grounds in *People* v. *Stokes* (1894), 103 Cal. 193, 197 [37 P. 207, 42 Am.St.Rep. 102] ; *People* v. *Russell* (1909), 156 Cal. 450, 455 [105 P. 416], where defendant refused the court's offer to appoint other counsel; *People* v. *Dowell* (1928), *supra*, 204 Cal. 109, 113-114, where the court told defendant himself, more than thirty days before the date set for trial, that he must be prepared to go to trial, and "No incident injuriously affecting the substantial rights of defendant is noted as having occurred due to the absence of Mr. Coghlan [counsel of defendant's choice]"; cert. den., 278 U.S. 660 [49 S.Ct. 7, 73 L.Ed. 568] ; *People* v. *Dorman* (1946), 28 Cal.2d 846, 852 [172 P.2d 686] ; see, also, *People* v. *Whinnery* (1942), 55 Cal. App.2d 794, 798 [131 P.2d 33].)

Here, although it could be inferred that Mr. Coghlan had sufficient opportunity to arrange for his client's protection,

there is nothing in the record to show that defendant sought to delay his trial or that he appreciated the situation until May 23, when he appeared, unrepresented, and the court stated that he should "get busy today and see that you are represented [tomorrow]." Furthermore, the court's rulings as to a continuance must be considered, not alone, but in connection with subsequent rulings concerning the testimony of the first witness for the prosecution. This witness, one Edwards, a soldier, testified at a time when, as the trial court knew, Mr. Andrews (assuming that he had been able to devote all his time to defendant's case) had had less than one day to prepare. Edwards was the sole witness as to the basic question of whether the crime charged had been committed, who was not connected with the operation of brothels or the family quarrels interjected into evidence. He gave damaging testimony on direct examination, then, after a few questions on cross-examination, stated that he was confused and was excused at his own request. Edwards' demeanor on the stand was such that the trial judge stated that he was apprehensive "that he [Edwards] might throw a fit." Mr. Andrews said that he had "No objection" to the witness being excused and did not (as he did in the case of other witnesses) expressly request that the privilege of recalling Edwards for further cross-examination be reserved. Thereafter, when the importance of Edwards' testimony became apparent, the trial court, basing its ruling on the ground that "Mr. Andrews cross-examined," refused either to recall Edwards for completion of cross-examination or to strike his testimony. Instead, the trial court gave an instruction which may well have caused the jury to give particular credence to Edwards' testimony. The cumulative effect of these rulings followed by this instruction requires a reversal.

Edwards' testimony on direct examination was given with considerable hesitance although he was permitted to refresh his recollection by reading a transcript of his testimony before the grand jury. He testified that he rented from Rose a room near her "main establishment"; that on the night of November 13, 1940, he saw and heard Rose, her maid, defendant and Pelozzari; that defendant said, "I want the money now. . . . If we don't get it one way we'll get it another"; that defendant had a gun in his hand; that Rose said, "I haven't got it"; that he (the witness) saw and heard no more

of the transaction for "it was none of my business and I left."
On cross-examination the witness immediately became con-
fused. Defendant's counsel read a portion of the witness'
testimony before the grand jury and asked if that had been
his testimony. Edwards replied, "Sir, that was four years
ago. I don't remember. I have been overseas, and there's
a lot of things I don't remember. I don't know why I'm up
here sometimes." Court and defense counsel questioned him
briefly as to his recollection and he said, "All this confusion,
sir, I am rather hazy. . . . I'd like to be excused." The dep-
uty district attorney stated, "I'm afraid that is not possible,"
but defendant's counsel said, "No objection, your Honor."
The court questioned Edwards further and Edwards testified
that he was "shell-shocked." The court excused the witness.

On the third day of the taking of evidence Mr. Coghlan
asked that Edwards be recalled for cross-examination. At
this time the prosecution's case in chief was complete and the
importance of Edwards' testimony had become obvious. The
court said, "I have completely excused that witness. . . .
Mr. Andrews cross-examined. . . . That witness was a shell-
shocked soldier, who should not have testified." Mr. Coghlan
then moved that the testimony of Edwards be stricken and
the trial court denied the motion. This was in the presence of
the jury.

Thereafter, Mr. Coghlan was permitted to argue, outside
the presence of the jury, his motion to strike the testimony of
Edwards. He urged that defendant was "deprived of his
right to cross-examine after injurious facts were adduced upon
his direct examination." The court stated, "I don't think
that is the point involved here, for this reason: The [witness]
was cross-examined by Mr. Andrews. Mr. Andrews was the
one that made the suggestion that he be excused. . . . Now,
why aren't you sufficiently protected by reading that [Ed-
wards' testimony that his recollection was hazy, etc.] to the
jury, indicating to the jury the condition of this man in your
argument. . . . The jury saw this boy and he appeared to be
very shaky and very confused on the stand. . . . As a matter
of fact, I was very apprehensive, I thought he might throw a
fit on the stand." The trial judge further suggested that de-
fendant's counsel "prepare the instruction that the jury is
the sole judge of the weight of the testimony and the appear-
ance of this witness Edwards should be taken into considera-
tion by them, together with the testimony he gave." He de-

nied the motion to strike, he said, because "the witness was competent to testify and the weight to be given to his testimony is for the jury to determine."

The repeated assertion of the trial judge that "Mr. Andrews cross-examined" is not, in a reasonable and full measure construction of the term, supported by the record. The only testimony of Edwards which defendant tested on cross-examination was that, during the short time the witness observed the transaction, defendant had a gun and said, "If we don't get it one way we'll get it another." And the only development on cross-examination as to this testimony was that the witness was not sure whether defendant or Pelozzari had the gun and uttered the threat. Since, according to Rose, both defendant and Pelozzari displayed guns and uttered threats for hours, the uncertainty of the witness as to this particular point was of little importance. Although such meagre cross-examination as had taken place before the witness asked to be excused indicated that Edwards' general recollection was "hazy" it did not test his recollection specifically as to such vital, controverted matters (related by Edwards on direct examination) as the presence of the witness himself and of defendant, Pelozzari and Rose's maid on November 13, 1940, and as to whether, in fact, guns were displayed and threats made.

In a situation such as that which arose when Mr. Andrews attempted to cross-examine Edwards, where "the opposing party is deprived of the opportunity of a cross examination without fault upon his part, as in the case of the illness or death of a witness after direct examination, it is generally held that he is entitled to have the direct testimony stricken from the record." (28 R.C.L., p. 600; *Henderson* v. *Twin Falls County* (1938), 59 Idaho 97 [80 P.2d 801, 802, 806].) According to Professor Wigmore, "Principle requires in strictness nothing less. But the true solution would be to avoid any inflexible rule, and to leave it to the trial judge to admit the direct examination so far as the loss of cross-examination can be shown to him to be not in that instance a material loss." (5 Wigmore, Evidence (3d ed.) p. 110; the cases collected in note 4, pp. 110-111, show how "Courts differ in their treatment of this difficult situation"; cf. *People* v. *Russell* (1926), 80 Cal.App. 243, 246 [251 P. 699], and *Chamberlain* v. *Chamberlain* (1931), 114 Cal.App. 591, 594-595 [300 P. 100].)

462

The People emphasize that Mr. Andrews said that he had no objection to Edwards' being excused and urge that he indicated that he considered his opportunity for cross-examination sufficient. Of course defendant cannot complain if he had opportunity to cross-examine and failed to exercise his right. (Code Civ. Proc., §§ 1846, 2050; Wigmore, op. cit., pp. 111, 51.) But here it seems clear that the reason Mr. Andrews agreed to Edwards' request to be excused was that it appeared that the witness "might throw a fit"; furthermore, that because of Mr. Andrews' unfamiliarity with the case he was not at that stage of its development aware of the probable great importance of the direct testimony. The trial court when the matter was next brought to its attention by Mr. Coghlan knew the importance of Edwards' testimony and knew that Mr. Andrews at the time of such testimony had been required to represent defendant with less than one day in which to familiarize himself with the facts and background of the case. In the circumstances its failure even to attempt to secure to defendant his right of adequate cross-examination was an abuse of discretion.

Instead of recalling the witness or striking out his testimony the trial court gave an instruction (not the instruction prepared by defendant at its suggestion) that the jury "are the sole judges of the weight to be given to the evidence of any witness who may have testified in this case. And in this connection I desire to call to your attention the testimony of the witness David T. Edwards. I charge you that you are the sole judges or the worth or value or credibility of the testimony of this witness, and of every other witness." This does not purport to be a comment on the evidence. It is an instruction as to law which calls particular attention to the testimony of Edwards. We agree with defendant's contention that the instruction is erroneous. It is impossible to know what effect the naming of this incompletely cross-examined prosecution witness had upon the jury. They may have received the impression that his testimony deserved especial regard. We cannot, in view of the entire record, say that this possible erroneous impression was corrected by a previous instruction that "the Court is not expressing, nor does the Court desire to express, any opinion upon the weight of the evidence or any part of it, or on the truth or falsity of any witness' testimony."

For the reasons above stated the judgment and order appealed from are reversed.

Gibson, C. J., Edmonds, J., Traynor, J., and Spence, J., concurred.

CARTER, J.—I concur in the judgment of reversal, but upon the sole ground that the trial judge abused his discretion in denying defendant's motion for a continuance of his trial. I think it is clear that we have in this case a much less aggravated case of an arbitrary denial of the right of counsel to the defendant in a criminal case than existed in *People* v. *Dorman,* 28 Cal.2d 846 [172 P.2d 686], yet this court, in effect, though not expressly, holds that there was an abuse of discretion in denying a continuance in this case. However I believe that in this case as well as in the Dorman case the trial court abused its discretion if, indeed, it did not violate defendant's constitutional rights.

According to the opinion prepared by Mr. Justice Schauer the prosecuting attorney represented to the trial court that foreign witnesses had been subpoenaed and were present, but none were called during the trial of the case. Presumably on the basis of that representation the continuance was refused. While it is true that that factor was not involved in the Dorman case, in the instant case there had been (contrary to the Dorman case) a continuance of a month and the defense attorney may have been under a duty to arrange his time in a fashion that he would not have conflicting trial dates or withdraw from the case. In both cases the defendant was forced to go to trial without prepared counsel. In the instant case defendant at least had the prepared counsel of his choice for the major portion of the trial, while in the Dorman case he had an unprepared counsel for the *entire trial.* Moreover it is said by Justice Schauer "there is nothing in the record to show that defendant sought to delay his trial or that he appreciated the situation until May 23 when he appeared, unrepresented, and the court stated that he should 'get busy today and see that you are represented [tomorrow].' " In the Dorman case there was also *nothing in the record to show the defendant sought to delay the trial.* As pointed out in my dissent therein and which is not disputed: "Likewise, by analogy in the instant case, we should indulge in the presumption that there was no scheme or plan by appellant to secure

a postponement of the trial by the device of changing counsel. Otherwise the fundamental right is whittled away with the knife of a mere supposition that persons accused will impose upon the courts. . . . I think it is obvious that the trial court was not sufficiently solicitous in protecting the constitutional right of the appellant to the assistance of counsel as that right is defined in the Glasser and Powell cases. It used as a weapon to prevent appellant from having a counsel of his own selection, the threat of either not making such a choice or taking an unprepared counsel by the device of denying a continuance, all upon *the supposition* that appellant was attempting to obtain an unjustified delay in the trial.'' (Italics added.) (*People* v. *Dorman, supra,* at p. 862.)   Hence there is no basis for holding, at least by implication in this case, that defendant was deprived of prepared counsel of his own choice by the device of refusing a continuance, but that the defendant in the Dorman case was not.   As above stated, the arbitrary action of the trial judge in denying a continuance in the Dorman case was much more aggravated than in the case at bar.

Be that as it may, there can be no doubt whatsoever that the trial court abused its discretion in denying a continuance in the instant case.   Defendant's counsel was absent for a portion of the trial because he was engaged in another trial. Defendant was wholly without representation by counsel of his choice during a portion of the trial.   It was through no fault of defendant's counsel that he was absent and engaged in another trial.   The other case had been set for trial and he was unsuccessful in his endeavor to obtain a postponement thereof.   It may be inferred that the prosecuting attorney misrepresented the facts to the court in opposing the continuance.   It may be true generally that, standing alone, the engagement of defendant's counsel in another trial is not sufficient to compel the trial court to grant a continuance, but in such event *it must appoint counsel to represent defendant and give the new counsel time to prepare the case,* rather than forcing the defendant to trial without counsel—or with counsel who concededly knew nothing of the case and who is as unwilling to try it as defendant is to have him do so.   In the case at bar, at least in the first instance, defendant was even deprived of the opportunity to make his protest.   (*Thompson* v. *Thornton,* 41 Cal. 626; *People* v. *Logan,* 4 Cal. 188; 23 C.J.S., Criminal Law, §§ 980, 982, pp. 322, 326; see *People* v. *Russell,* 156 Cal. 450 [105 P. 416]; *People* v. *Warren,* 130

Cal. 678 [63 P. 87]; *People* v. *Goldenson,* 76 Cal. 328 [19 P. 161].) In the instant case there may have been the appointment of counsel (Mr. Andrews) in the absence of defendant's counsel, but not only was he not given time for preparation but the arrangement was unsatisfactory to both client and attorney.

In my opinion the only sound basis for a reversal of the judgment in this case is that the trial judge abused his discretion in denying defendant's motion for a continuance of the trial to enable him to obtain counsel of his choice prepared to conduct his defense. The majority opinion states, but fails to squarely decide this issue. This failure is no doubt due to its inability to distinguish this case from the Dorman case, *supra.* Plainly, all of the distinguishing features of the two cases are in favor of the holding of the trial court in the case at bar, and if the decision of this court in the Dorman case is sound, the judgment in the case at bar should be affirmed.

The refusal of the trial court to permit defendant to recall the witness *Edwards* for further cross-examination, was clearly not reversible error. The witness had been excused by defendant's counsel (Andrews) without reservation, and he was not in attendance or available as a witness at the time of the request. Certainly, denial of a request to recall a witness under such circumstances cannot constitute prejudicial error requiring the reversal of a judgment in a criminal case.

The holding of the majority opinion, that the refusal to permit the recall of Edwards for further cross-examination constituted prejudicial error, is based upon the assumption that Mr. Andrews would not have excused Edwards without reservation had he been prepared to try the case, or rather that if Mr. Coghlan would not have done so because he knew the importance of Edwards' testimony. But this amounts to nothing more than saying that if the trial court would have granted a continuance so that Mr. Coghlan or some other attorney prepared to try the case had been representing defendant from the beginning of the trial, the witness Edwards would not have been excused until he had been subjected to a thorough cross-examination. In other words, the basis of all the error complained of was the refusal of the trial court to grant a continuance of the trial.

I can see no escape from the proposition that if the trial court properly denied the continuance, it likewise properly

denied the request to recall the witness, as the latter request was based upon the unpreparedness of Mr. Andrews to try the case, which was due to the refusal of the court to grant a continuance.

In the Dorman case, *supra,* this court affirmed a judgment of conviction of the crimes of murder, kidnapping and robbery against a 19-year-old boy, who was a sergeant in the United States Army, where the attorney of his choice had but two days to prepare for trial and the public defender who had been previously appointed admitted that he was not prepared to try the case. The trial court nevertheless denied defendant's motion for a continuance even for one week, and a majority of this court upheld this arbitrary action. I insist that if this is good law, the judgment in the case at bar should be affirmed. However, I am convinced that such decisions violate both the spirit and letter of our constitutional guarantees, and that this judgment should be reversed.