[Crim. No. 5100. In Bank. Jan. 19, 1951.]

THE PEOPLE, Respondent, v. FRED STROBLE, Appellant.

John D. Gray, Harold J. Ackerman, Harry Kitlar, Clore Warne, Edmund W. Cooke, A. L. Wirin, Fred Okrand, Loren Miller, Robert S. Morris, Jr., Bayard F. Berman and Leon M. Cooper for Appellant.

Fred N. Howser, Attorney General, Frank Richards, Deputy Attorney General, W. E. Simpson, District Attorney, and A. Alexander, Deputy District Attorney, for Respondent.

SCHAUER, J.—Defendant appeals from a judgment which imposes the death sentence and from an order denying his motion for a new trial. He was charged with murder and pleaded not guilty and not guilty by reason of insanity. The death sentence was imposed pursuant to a jury verdict which found him guilty of first degree murder and the trial court's finding, after waiver of jury on the insanity phase of the trial, that he was sane at the time of the homicide. We have concluded that defendant was fairly tried and properly convicted.

It is true, as defendant points out, that the record discloses that representatives of the People, prior to the trial, were guilty of flagrant misconduct. Such misconduct, how-

ever reprehensible, does not appear, under the extraordinary circumstances of this case, to have materially affected the regularity of defendant's trial and conviction; and it is not the function of this court to reverse a judgment solely as a rebuke to "law enforcement" officers for their own lawless acts, and improper administration of law, independent of the trial which resulted in that judgment.

## Sufficiency of Evidence

Defendant urges that the evidence does not show deliberation and premeditation. Except as to this issue there is little conflict in the evidence as to any significant fact, either objective (defendant's physical acts, which included the infliction of many mortal wounds) or subjective (defendant's state of mind, which included the ultimate fact of specific intent to kill). There is much expert testimony variously interpreting defendant's state of mind in relation to "deliberation" and "premeditation." Defendant did not take the stand; his description of his unwitnessed behavior is found in seven detailed confessions, all in substantial accord, and at least five of which appear to have been voluntarily and legally given.

Defendant's victim was a girl, 6 years of age. On the day of the killing (November 14, 1949) defendant, a man of 68, was in a state of nervous apprehension and had been drinking alcoholic beverages. This mental state, which was an important contributing cause of the homicide, arose in the following manner: Four months previously defendant had been arrested on a charge of contributing to the delinquency of minors. The charge was based largely upon his having assertedly fondled small girls to satisfy his sexual desires. Defendant was released on bail. He did not appear for trial, but fled from the state, and a warrant for his arrest was issued. In November he furtively returned to Los Angeles to visit his daughter, son-in-law and their children. The son-in-law told defendant that he must surrender to the authorities. Defendant was terrified at the prospect of going to the police; he promised to, but did not, do so.

Defendant was alone in the home of his daughter and son-in-law on the afternoon of November 14. His victim came to the house seeking defendant's grandchild, her playmate. Defendant kissed and fondled her. Assertedly, the child on previous occasions had submitted to such treatment without protest and with apparent pleasure. On this occasion, however, she objected and started to scream. Defendant, in a

terrified attempt to silence her, choked her with his hands. She became quiet; he stopped choking her; then she moved again; and defendant knotted a necktie tightly around her neck. Then, with intent to kill the child (who was not yet dead) in order to terminate her suffering, defendant inflicted the following injuries with various instruments which he obtained successively from various places: Two hammer blows on the temple; three stab wounds, two in the chest and one in the back, with an ice pick; six skull fractures with the blunt end of an axe; one stab wound, which cut the spinal cord, in the back of the neck with a kitchen knife. The last wound was in imitation of the final wound which defendant had seen inflicted on bulls at bull fights.

Defendant then went to Ocean Park, rented a room under an assumed name, and spent two days wandering about. On the morning of November 17 he returned to Los Angeles. He was sitting in a bar at Fifth and Hill Streets, drinking beer and attempting to decide whether he should get in touch with his family, the attorney who had represented him in connection with the pending morals charge, or the police, when he was arrested.

### Corpus Delicti

Defendant urges that the corpus delicti was not proved by evidence independent of his confessions. He argues that there is nothing in the record except his extrajudicial statements which could show that the murder was deliberate and premeditated, because (citing *People* v. *Letourneau* (1949), 34 Cal.2d 478, 487 [211 P.2d 865]) deliberation and premeditation cannot be inferred from the manner in which the wounds were inflicted. The Letourneau case does not support this argument. There, Letourneau's attorney asked the autopsy surgeon whether "whoever inflicted the wounds on this woman certainly must have been operating at the time under an abnormal . . . frame of mind." An objection to this question was held to have been correctly sustained, in that, as was expressly pointed out, "it is not shown that from the nature of the wounds alone the doctor could draw any material inferences which the jury themselves could not draw"; it is not there suggested that the jury could draw no inferences from the condition of the victim's body. Here, five different implements were used, each in a manner evidencing an intent to inflict death, not merely injury or random mutilation. There is evidence apart from defendant's confessions that before the child's death the implements were at various

places about the premises. An inference can be drawn that the killer who collected and used the implements had determined that he wished to bring about death and carried out that determination. This, in the light of the other circumstances including the charges against defendant which were then pending, is a sufficient prima facie showing of deliberation and premeditation.

### Asserted "Atmosphere of Public Pressure"

Defendant claims that he was deprived of a fair trial because the trial court did not protect him from, and the district attorney fostered, "public pressure." The killing and the subsequent search for defendant received much publicity. Immediately after defendant's arrest he was taken to the office of the district attorney, interrogated, and confessed. The district attorney, even before defendant completed his statement, released to the press details of the statement (including defendant's admissions of sex play with his victim and other children on occasions prior to the killing) and also announced his belief that defendant was guilty and sane. At the time of defendant's arrest and at the time of his trial (which began some seven weeks later) there was notorious widespread public excitement, sensationally exploited by newspaper, radio and television, concerning crimes against children and defendant's crime in particular. In these circumstances, defendant urges, it was impossible for him to obtain an unbiased jury, and due process requires a new trial even though there is no showing that any juror was actually influenced by the sensational publicity and the popular hysteria.

In connection with his claim of "public pressure" defendant also calls attention to the following statement by one of his counsel (veteran Deputy Public Defender John J. Hill; defendant was not then represented by his present private counsel) made during his closing argument: "I wish to make this commentary with reference to just what has occurred before the Court took the Bench. I refer to the televising and the pictures taken of the jury entering the box, and with counsel. . . . I don't like this added publicity in the case; and yet we conform, we cooperate with the men, our fellow human beings in the vocation, and therefore we accept it as part of what we have to expect in a case that has attracted so much attention, that has been so widely publicized, and concerning which there have been utterances over the radio, in the public press, which have unduly accentuated the im-

portance of this case . . . [W]e shall not be influenced in the slightest degree in that calm deliberation, dispassionate discussion, and arriving at a verdict under the institutions under which we live, and concerning which we are proud: the American way of the conduct of a trial.''

It seems that the traditional concept of the ''American way of the conduct of a trial,'' particularly a trial for a sordid criminal offense such as that of defendant, includes both the aspects mentioned so understandingly by Mr. Hill: on the one hand overstimulation, by mass media of communication, of the usual public interest in that which is gruesome; on the other hand a trial by a judge and jury immune from the public passion. General denunciations of the journalistic sensationalism which customarily surrounds a trial such as that of defendant, and which did surround defendant's trial, do not solve the question whether defendant's trial was fair. We may agree with defendant that it was improper for the district attorney to issue ''play-by-play bulletins'' during the course of defendant's confession. But there is no indication that the jury, two months after the improper statements were made and immediately after hearing evidence, based their verdict on the newspaper accounts of the statements rather than upon the evidence. We can also assume that it was improper to allow the taking of news photographs or televising of scenes in the courtroom; but there is no indication that the jury's verdict was influenced by the taking of the pictures or the televising of courtroom scenes.

As defendant points out, the bias of jurors who have been exposed to repeated sensational publicity concerning a case is likely to be unconscious; they may honestly disclaim bias and yet have unknowingly prejudged the case. But where, as here, the defendant has been represented by able and experienced counsel, the evidence of guilt is ample, and the presentation of the case in court (despite the improper taking of pictures and televising) is fair, we should not reverse because of mere speculation that the jury might unconsciously have been improperly influenced adversely to defendant in the performance of their duties.

### Confession of Defendant Made in the District Attorney's Office Immediately After Arrest

Defendant contends that admission in evidence of this confession was a denial of due process. There is no claim that the confession is false; in fact, defendant relies on it as true

in his discussion of the asserted insufficiency of the evidence; and its substance is the same as that of other confessions which were put in evidence without suggestion that they were coerced or made under the influence of the asserted previous coercion.

It is asserted that the following circumstances made the first confession involuntary: Prior to defendant's arrest, a complaint charging him with murder had been filed and a warrant for his arrest had been issued. At about 11:50 a. m. on November 17, 1949, defendant was arrested. The arresting officer "pulled him off the stool [in a bar where defendant was drinking beer] and searched him" and took him to the park foreman's office in adjacent Pershing Square. There the officer at once reported by telephone to the Homicide Division. Defendant was asked "if he was guilty of what he was accused and he mumbled something under his breath that sounded like 'I guess I am,'" and the park foreman slapped defendant with his open hand, knocking off defendant's glasses. The officer then searched defendant thoroughly; he "stood Stroble up facing the wall and put his hands up against the wall . . . and kicked his feet out so he would be off balance for the search. . . . [T]wo or three times he put his feet forward," and the officer "just kicked his feet back out again." The kicks assertedly were directed at defendant's toes "and possibly it slipped off and he hit his shin once or twice." Then, while waiting for the homicide officers, the arresting officer "was pacing back and forth and he took out his sap stick and he held it up and asked Fred Stroble if he had ever seen one of these," and waved it under defendant's nose. Defendant said nothing and the officer put away the stick. A police car arrived, defendant was taken to Wilshire Station, and at 12:30 p. m. he was turned over to the homicide officers who were working on the case. They took defendant to the hall of justice. Instead of taking him before a magistrate immediately (the municipal court was on the 7th floor of the hall of justice) they took him to the district attorney's office (which was on the 6th floor of the same building). Defendant arrived at 1 p. m. and was questioned until 3 p. m. Before defendant entered the office a wire recorder had been put in operation, and the questioning was recorded. The questioning was also taken in shorthand by five stenographers, working in relays. There were present 19 representatives of the police department and the district attorney, but practically all the questioning was done by a single deputy district

attorney. Defendant was offered water and cigarettes and was not physically mistreated during the questioning. Prior to the questioning he was not advised that he had any right to counsel or that his statements could be used against him. He did not ask to communicate with his family or a lawyer, but he was not informed that, as will hereinafter appear, an attorney who had previously represented him was attempting to communicate with defendant.

■■ We may assume that, as a matter of law under the circumstances shown, this first confession was the result of physical abuse or psychological torture or a combination of the two (cf. *Watts* v. *Indiana* (1949), 338 U.S. 49 [69 S.Ct. 1347, 93 L.Ed. 1801]; *Turner* v. *Pennsylvania* (1949), 338 U.S. 62 [69 S.Ct. 1352, 93 L.Ed. 1810]; *Harris* v. *South Carolina* (1949), 338 U.S. 68 [69 S.Ct. 1354, 1357, 93 L.Ed. 1815], reversing convictions because of the admission of confessions elicited after intensive questioning by relays of officers for hours a day over periods of days). We may further assume that from the record it appears as a matter of law that defendant, although legally sane, was of somewhat weakened mentality (the result of arteriosclerosis and the excessive use of alcohol), and that this first confession was the result of terror indubitably following from the slap by the park foreman, the repeated acts of battery by the arresting officer when he searched defendant, and the presence of 19 law enforcement officials and five stenographers while defendant was questioned. The introduction in evidence of such a confession, if it were material at all, would offend the due process clause of the Fourteenth Amendment. (See *Ashcraft* v. *Tennessee* (1944), 322 U.S. 143, 154 [64 S.Ct. 921, 88 L.Ed. 1192]; *Haley* v. *Ohio* (1948), 332 U.S. 596, 599 [68 S.Ct. 302, 92 L.Ed. 224]; see also *Foster* v. *Illinois* (1947), 332 U.S. 134, 137 [67 S.Ct. 1716, 91 L.Ed. 1955]; *Gibbs* v. *Burke* (1949), 337 U.S. 773, 781 [69 S.Ct. 1247, 93 L.Ed. 1686].) But here the use of the first confession could not have affected the fairness of defendant's trial, because defendant thereafter made at least five confessions, of materially similar substance and unquestioned admissibility, which were put in evidence. It does not appear that the outcome of the trial would have differed if the first confession had been excluded, nor does it appear that the coercive influence surrounding the first confession continued to operate on the mind of defendant and induce subsequent confessions which were made after defendant had consulted with counsel and been taken before a magistrate

624

(*cf. People* v. *Jones* (1944), 24 Cal.2d 601, 609 [150 P.2d 801]).

*Violation of Defendant's Rights To Be Taken Before a Magistrate and to Counsel Immediately After his Arrest*

■ Defendant's first two confessions (one made in the district attorney's office and one made shortly thereafter to the county jail physician) were obtained during a period when rights of defendant under the state Constitution and Penal Code were being flagrantly violated. At 1:43 p. m., while defendant was making his first confession, John D. Gray, an attorney at law, arrived at the district attorney's office and asked to see defendant. Mr. Gray was attorney of record for defendant in connection with the pending charges of contributing to the delinquency of minors. He came to see defendant at the request of defendant's son-in-law. All this was known to the deputy district attorneys and police officers who were working on the murder case. Nevertheless the representatives of the People refused Gray's repeated requests and demands that he be allowed to see defendant. At 3 p. m., after defendant had confessed, he was taken from the office of the district attorney and was rushed past Mr. Gray, who was still waiting outside the office to see defendant. Officers drove defendant to the office of a physician, who gave defendant a physical and mental examination; in the course of the examination defendant made a second confession. Defendant was then taken to the county jail and there, at 9:30 p. m., Mr. Gray was finally allowed to talk with him for the first time since defendant's arrest. The next morning defendant was taken before a magistrate.

The above described procedure was in violation of section 8 of article I of the state Constitution, which provides, ''When a defendant is charged with the commission of a felony, by a written complaint subscribed under oath and on file in a court within the county in which the felony is triable, he shall, without unnecessary delay, be taken before a magistrate of such court. The magistrate shall immediately deliver to him a copy of the complaint, inform him of his right to the aid of counsel, ask him if he desires the aid of counsel, and allow him a reasonable time to send for counsel.'' It apparently was also in violation of section 825 of the Penal Code, which provides, ''The defendant must in all cases be taken before the magistrate without unnecessary delay, and, in any event, within two days after his arrest, excluding

Sundays and holidays; and after such arrest, any attorney at law entitled to practice in the courts of record of California, may at the request of the prisoner or any relative of such prisoner, visit the person so arrested. Any officer having charge of the prisoner so arrested who willfully refuses or neglects to allow such attorney to visit a prisoner is guilty of a misdemeanor.[1] Any officer having a prisoner in charge, who refuses to allow any attorney to visit the prisoner when proper application is made therefor shall forfeit and pay to the party aggrieved the sum of five hundred dollars, to be recovered by action in any court of competent jurisdiction." (See also Pen. Code, § 848 ["An officer making an arrest, in obedience to a warrant, must proceed with the person arrested as commanded by the warrant, or as provided by law"] ; § 814 [form of warrant: "you are . . . commanded forthwith to arrest the above-named C. D. and bring him before me . . . or . . . before the nearest or most accessible magistrate in this county"] ; § 145 [willful delay in taking before magistrate is misdemeanor] ; § 858 ["when the defendant is brought before a magistrate upon an arrest . . . on a charge of having committed a public offense, the magistrate must immediately inform him of the charge against him, and of his right to the aid of counsel in every stage of the proceedings"].) It is apparent that here the delay in taking defendant before a magistrate (where defendant would have been advised of his right to counsel) was "unnecessary," for a municipal court open for business was located in the same building as the office where defendant was held and questioned, but defendant was not taken to such court; even after the questioning he was taken from that building for further examination by a physician. It is also apparent that defendant should have been allowed to see Mr. Gray, who was present at the request of defendant's son-in-law, a "relative of such prisoner" (Pen. Code, § 825). We disregard as a quibble the suggestion of the People that their officers had no duty to let Mr. Gray see defendant because Gray did not wish to advise or represent defendant but was present because of mere .curiosity.

The conduct of the officers, as above related, was patently illegal. Its illegality is not lessened by argument that similar conduct is not unusual or that such conduct makes the work of the police and the district attorney easier. In the present

---

[1]No showing has been made that any disciplinary action, or any criminal prosecution, has been instituted as against any of the offending officials.

case the conduct cannot even be explained as an expedient born of desperation to meet an imperative exigency. (*Cf.* the situations described in the concurring and dissenting opinion of Mr. Justice Jackson in *Watts* v. *Indiana* (1949), *supra*, p. 58 of 338 U.S. ["no one suggests that any course held promise of solution of these murders other than to take the suspect into custody for questioning. The alternative was to close the books on the crime and forget it, with the suspect at large"] ; and in the majority opinion of Mr. Justice Black in *Upshaw* v. *United States* (1948), 335 U.S. 410, 414 [69 S.Ct. 170, 93 L.Ed. 100] ["The arresting officer himself stated that petitioner was not carried before a magistrate [more promptly] . . . because the officer thought there was 'not a sufficient case' for the court to hold him"] ; see also the majority opinion of Mr. Justice Douglas in *McDonald* v. *United States* (1948), 335 U.S. 451, 456 [69 P. 191, 93 L.Ed. 153].) We can only conclude that the representatives of the People, when they unreasonably and illegally refused to permit Mr. Gray to see Stroble, yielded in some degree to the general hysteria which was manifest by such symptoms as the slapping of Stroble by the park foreman, the kicking of him by the arresting officer, and by popular demands for more federal legislation against "sex crimes."

█ Theoretically, taking defendant promptly before a magistrate and permitting Mr. Gray to consult with defendant immediately upon his arrival at the district attorney's office, might have been of considerable importance to defendant on his subsequent trial. If defendant had been confessing reluctantly, it would have been particularly important to him to know that he could remain silent; if he had been confessing in extravagant and exaggerated terms, it would have been particularly important for him to know that his words could be used against him. As the situation actually developed, however, it became obvious that defendant did not wish, or was not able, to remain silent. After he had consulted with Mr. Gray and with attorneys from the public defender's office defendant continued repeatedly to make detailed confessions. Each of these confessions appears to be an attempt by defendant, to the best of his ability, to recount the entire truth as to the killing, including his state of mind at the time. In these circumstances the violation of his constitutional and statutory rights immediately after his arrest appears not to have affected the outcome of defendant's trial. The situation is not like that in such cases as *People* v. *Sarazzawski* (1945),

27 Cal.2d 7, 11 [161 P.2d 934], and cases there cited, where judgments of conviction were reversed because of fundamental defects in the conduct of the trial, on the theory that, even though it appeared that the defendant was guilty, there was a miscarriage of justice because of the denial to him of fair, orderly trial procedure.

*Asserted Deprivation of Effective Representation by Counsel at the Preliminary Hearing*

■ On Friday, November 18, the day after defendant's arrest, he was taken before the municipal court, arraigned, and a deputy city public defender was appointed to represent him. The municipal court fixed Monday, November 21, as the date for preliminary hearing, rather than November 22, as requested by the deputy. Defendant contends that his representation at the preliminary hearing was only pro forma because his counsel was not allowed sufficient time to prepare. However, defendant does not point out any respect in which he was prejudiced and, furthermore, the deputy, when he appeared on November 21, stated that he was ready and did not request a continuance.

*Trial Court's Refusal to Permit Voir Dire Examination of Juror at Beginning of Insanity Section of the Trial*

■ The original jury returned to try the issue of defendant's sanity. Deputy Public Defender Al Mathews, representing defendant, then asked permission to further examine a juror on voir dire. The trial court refused permission. Mr. Mathews began an offer to prove that the juror in question had falsely answered, on the original voir dire examination, a question as to his occupation. The trial court interrupted the offer and asked that counsel discuss the matter in chambers. The greater part of what took place in chambers was not made a part of the record on appeal which was first prepared. Defendant's present counsel (who did not represent defendant during the trial) argued in his opening brief that the trial judge, by refusing to permit further examination of the juror, prevented (or may have prevented) Mr. Mathews from showing facts which had developed since the original voir dire examination and which would disqualify the juror. On motion of defendant the record on appeal has since been augmented by inclusion of the discussion in chambers. It now appears from the record that after the first stage of the trial had begun the matters concerning which Mr. Mathews wished to examine the juror had been brought to the atten-

tion of the trial judge and counsel by an informer; counsel for the defendant and for the People had agreed that if there was any question as to the juror's disqualification an alternate juror would be substituted; investigation by representatives of the district attorney and public defender disclosed that the informer's charges against the juror were unfounded; no objection to the juror was made until after the jury had found defendant guilty; then Mr. Mathews, in a voice which was loud enough to be heard by the jurors, raised the question of the juror's qualification. It thus appears from the augmented record that defendant's claim that he was prevented from disclosing possible bias on the part of the juror is without merit.

### Asserted Deprivation of Defendant's Right to Counsel of His Choice on Trial of the Issue of Insanity

During the trial of the issue of not guilty Deputies Mathews and Hill of the public defender's office handled the defense in the courtroom. Only Mr. Mathews had interviewed defendant, but Mr. Hill had been present and active on defendant's behalf at all times during the trial. Public Defender Ellery Cuff had not met defendant or appeared for him in court, but he was familiar with the case, having read the daily transcript and consulted with and advised Mr. Mathews and Mr. Hill and interviewed witnesses during the trial. It appears from the record of the above mentioned discussion in chambers at the beginning of the insanity stage of the trial that the trial judge believed that Mr. Mathews acted improperly in raising the question of the juror's qualification in the presence of the jury and also believed that certain prior conduct of Mr. Mathews (not in trying the case but in preparing the defense and in releasing information about it) was improper; therefore the trial judge asked Public Defender Cuff "to attend upon the remainder of this trial . . . to see that this trial is conducted in a manner in which I believe trials should be conducted." The transcript of this discussion further shows that there had been previous discussions concerning Mr. Mathews' conduct, the substance of which need not here be set out. It is sufficient to note that these matters were never discussed in the presence of the jury and the judge's disapproval of Mr. Mathews' conduct was not expressed before them, so that the triers of fact could not have been influenced against defendant by such disapproval. A recess followed the discussion in chambers at the beginning

of the trial of the sanity issue. At the beginning of the recess (as appears from testimony on defendant's motion for new trial) Mr. Mathews introduced Mr. Cuff to Mr. Stroble. Thereafter Mr. Cuff discussed waiver of the jury with Mr. Mathews and Mr. Hill and also asked the advice of Judge William B. Neeley, who had had long experience as public defender. At about 10 minutes before 2 p. m. Mr. Cuff and Mr. Bliss visited defendant in the prisoner's room, near the courtroom. Mr. Cuff told defendant that on a jury trial of the insanity issue evidence of details of all other instances of his molestation of children could and probably would be presented by the prosecution, the possible harmful effect of such evidence was discussed, and defendant said, "I have had enough of that jury. Get rid of them." He repeated this at least three times. When court reconvened at 2 p. m. Mr. Mathews was present but silent. Mr. Hill, who had not talked with defendant, said, "Information has been conveyed to me that it is the desire of the defendant . . . to withdraw the case on the . . . plea of not guilty by reason of insanity, waiving his right to a trial by jury . . . Is that correct, Mr. Stroble?" Defendant replied, "That is correct." The question whether defendant waived a jury trial, and defendant's affirmative answer, were repeated. Counsel joined in the waiver, and stipulated that the question be submitted on the evidence already in the case and the written reports of six physicians who had examined defendant.

Defendant contends that his right to counsel of his choice was violated because Mr. Mathews, the only public defender whom defendant had come to know personally and in whom defendant had confidence, did not interview defendant as to the waiver of jury and actively represent defendant on the trial of the sanity issue. Defendant's right to counsel does not include the right to be represented by a particular deputy public defender. (See *People* v. *Manchetti* (1946), 29 Cal.2d 452, 458 [175 P.2d 533].) The record sustains defendant's assertions that Mr. Mathews was required to retire from the active representation of defendant because Mr. Cuff and the trial judge disapproved of certain things he had done in connection with the case; it does not sustain defendant's charge that thereafter he was not properly and adequately represented. This will appear from the subsequent discussion of defendant's contentions that two important steps taken by his counsel on the trial of the issue of sanity were ineffective.

### Asserted Invalidity of Defendant's Waiver of Jury Trial

■ Defendant argues that his waiver of a jury at the insanity stage of the trial was ineffective because he did not understand the meaning of "waiver of jury." On the motion for new trial defendant, Mr. Cuff, and Mr. Bliss, an investigator for the public defender's office, testified to their conference which resulted in the waiver of a jury. There is a sharp conflict between defendant's testimony and that of Mr. Cuff and Mr. Bliss as to what was said. Defendant relies upon his own testimony that he did not understand the meaning of "waiver of jury" and it was not explained to him; that he did not say, "Get rid of them"; that "I didn't even know that could be done. I always had that idea that a jury and counsel should be there from the beginning to the end." We accept the determination of the trial judge, who saw and heard the witnesses and who announced that he believed the testimony of the public officials and disbelieved defendant.

In this connection defendant also calls attention to the statement of Mr. Cuff, made in chambers preceding his conference with defendant, that he had "had little or no contact with Mr. Stroble. It would be difficult for me to handle——" However, Mr. Cuff was familiar with the development of the case and, particularly after conferring with Deputies Hill and Mathews, who had "handled" it throughout, was in a position to intelligently advise defendant of the probable course of a jury trial of the sanity issue and the meaning of "waiver."

### Failure to Examine Witnesses on the Trial of the Sanity Issue

■ As previously stated, defendant by stipulation submitted the issue of sanity on the testimony adduced at the trial of the not guilty issue and on the written reports of six physicians who had examined defendant. Defendant now argues that this procedure, in effect, deprived him of any trial on the issue of his sanity because no evidence that defendant was legally insane had been introduced on the trial of the issue of not guilty and because the doctors' reports were hearsay. However, defendant does not suggest that he could have produced evidence of insanity under the right-and-wrong test if a different procedure had been followed. It does not appear that any harm was done to defendant's cause by the manner in which the sanity issue was submitted, nor that

such submission shows any lack of wisdom or preparedness on the part of defendant's counsel.

### Conclusion

Defendant has pointed out no instance of misconduct or error which appears to have affected the result of the trial. Misconduct which did not make the trial itself unfair, nor amount to a breach of due process, is not ground for reversal of a conviction. Therefore, the judgment and order appealed from are affirmed.

Gibson, C. J., Shenk, J., and Traynor, J., concurred. Edmonds, J., Carter, J., and Spence, J., concurred in the judgment.

Appellant's petition for a rehearing was denied February 15, 1951.