Filed 5/29/24  P. v. Miranda CA5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>JUAN CARLOS MIRANDA,<br><br>　　Defendant and Appellant. | F085591<br><br>(Super. Ct. No. F19905565)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Alvin M. Harrell III, Judge.

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Christopher J. Rench and Jessica A. Eros, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Juan Carlos Miranda was convicted by jury of second degree murder for the death of Michael Salciedo[1] (Pen. Code,[2] § 187; count 1). The jury also found true appellant had personally used a firearm causing a death (§ 12022.53, subd. (d)).[3] Appellant was sentenced to a prison term of 15 years to life on count 1 plus 25 years to life for the firearm enhancement. Appellant appeals from the judgment of conviction, asserting several grounds for reversal.

Appellant contends the trial court erred by: (1) declining to strike the testimony of a witness appellant asserts refused to be cross-examined, which resulted in a violation of his Sixth Amendment right to confrontation; (2) allowing the same witness to testify he was refusing to answer questions because doing so would put his life in danger; (3) permitting two prosecution witnesses to express improper lay opinions on appellant's guilt; (4) failing to instruct the jury sua sponte on how to evaluate expert opinion testimony; and (5) improperly telling the jury Salciedo was a "victim," which, according to appellant, had the effect of reducing the prosecution's burden of proof.

Appellant further contends his trial counsel rendered ineffective assistance by failing to object to alleged prosecutorial misconduct in closing arguments. Appellant also contends the matter must be remanded for resentencing because the trial court's comments at sentencing suggested it did not know it had discretion to strike the firearm enhancement or impose a lesser enhancement. Finally, appellant contends the abstract of judgment contains clerical errors, which respondent concedes must be corrected.

---

[1]  Salciedo's name is spelled "Salciedo" in the reporter's transcript and "Salcido" in the charging documents. We use "Salciedo" here for consistency.

[2]  All further undesignated statutory references are to the Penal Code.

[3]  This was appellant's second trial. The first was declared a mistrial due to jury deadlock. In arguing for the admission of Facebook evidence outside the presence of the jury, the prosecutor represented the jury was hung based on "concerns about whether these individuals knew each other."

We remand with directions to amend the abstract of judgment to correct the clerical errors. We affirm the judgment in all other respects.

## FACTS

On July 23, 2019, Salciedo and his friend, David Phillips, encountered two other individuals behind a gas station, resulting in one of them shooting and killing Salciedo. Based on their investigation utilizing security footage from the inside of the gas station shortly before the shooting, police eventually determined the two other individuals were appellant and Gilbert Lopez. According to the security footage, later corroborated by a Facebook post, at the time of the shooting, appellant was wearing a light grey colored shirt and Lopez was wearing a black shirt and a baseball cap.

Valerie Odeh was an eyewitness to the shooting. She was Salciedo's friend and was giving him a ride in her Tahoe to the area near the gas station. At one point before reaching their destination, Odeh stopped the vehicle, two individuals Odeh did not know (later identified as appellant and Lopez) walked by, and one of them said, "What's up, dog?" to Salciedo. Salciedo responded by saying, "What's up?" At the time, Odeh did not think much of it; they drove down the road, and Salciedo saw Phillips and got out to speak to him. Odeh made a U-turn to leave the area and saw the same two individuals from earlier—appellant and Lopez—approach Salciedo and Phillips right in front of her vehicle.

Salciedo and Phillips appeared to be arguing with appellant and Lopez, and all four individuals appeared to be getting ready for a fight. Odeh believed either Salciedo or Phillips may have taken a swing. At one point, the person who said, "What's up, dog?" earlier, the younger of the other two, pulled out a gun, which Odeh believed to be a revolver, and shot Salciedo five times. She did not see anyone else with a weapon. Odeh noted Salciedo did not have a shirt on and did not have any weapons on him.

3.

According to Odeh, Salciedo was running away at the time he was shot, and she saw multiple shots hit Salciedo's back. After the shooter fired the shots, he and the other person ran into an empty field.

Immediately after the shooting, Odeh went into the gas station and had the clerk call 911, and thereafter the police arrived. The body camera footage from after the shooting was admitted showing that at the scene Odeh identified the shooter as wearing a grey or beige shirt and the other individual as wearing a baseball cap.

Later, Odeh was shown a photographic lineup and identified a decoy as the shooter. When shown a still from the gas station security footage, however, she pointed at appellant immediately and stated, "Yeah this guy right here." She stated she knew he was wearing a grey shirt, and she saw him pull the gun out of his waist band. She said Lopez's black and white hat looked familiar but pointed at appellant and stated, "I know it was this guy that did it with the grey. This is the shooter."

In court, Odeh identified appellant as the shooter. She also testified she had positively identified him at the preliminary hearing in December 2019. She recognized the "roundness" of his face. Odeh testified her young daughter was in the vehicle with her during the incident, so she was concerned for her daughter's safety. She did not really see the suspects' faces and made her identification based on what they were wearing.[4] She further testified she was positive the man in the baseball cap was not the shooter.

Two other percipient witnesses testified as well, though neither saw the shooting. Timothy Ankenman testified he was exiting the parking lot of the gas station in his vehicle and heard gunshots. He heard at least five continuous shots. He could tell the shots were all in Salciedo's direction based on the injuries he later saw on Salciedo. He saw Salciedo fall to the ground where he was standing and two people take off running

---

[4]     Odeh also testified she was colorblind in one eye and that beige and grey and black are all similar to her.

then jump over a fence. He did not see any fighting prior to the shooting. The two individuals running from the scene ran in front of his vehicle, and there was a height difference between them.[5]

Ankenman did not get a clear look at the two individuals' faces. He testified he told Detective Melanie Mayo—the lead detective on the case and prosecution's chief investigative officer—that the larger or taller person was wearing a white shirt. He testified he did not remember seeing him with a gun, but after being refreshed with his statement previously made to Detective Mayo, testified that he had something in his hand. At trial, Ankenman stated he thought it might have been a hat. He testified the taller person was running ahead of the shorter person and remembered telling Detective Mayo that the taller person looked way more frantic than the guy behind him. After the shots, the taller person was staring at the person who got shot. He had told Detective Mayo the person had arm tattoos but did not remember that at the time of his testimony. When shown the still of the gas station security footage at trial, he identified appellant as who he believed was the shooter.

Jose Leonardo Barajas testified he was behind the gas station trying to find an entrance and saw four people that "looked like they were getting ready to fight." Two guys were standing in front of two other guys and they were "kind of arguing, you know, getting ready to fight." He did not see anyone throw a punch and did not see anyone holding a gun. He focused on them for "a second" before moving his car to try to find his way to the entrance when he heard the gunshots. He heard two to three shots and then saw one man stumble backwards "like he was trying to run away type of motion" and fall. The two other individuals ran away; he described them as having shaved heads, no shirts, and suntans. He did not see any weapons and did not see their facial features.

Almost a month after the shooting, Lopez's ex-girlfriend, Jeanette Maya, gave a lengthy interview to Detective Mayo, a recording of which was played for the jury.

---

[5]     The security footage shows appellant appears to be the taller of the two.

5.

During that interview, Maya stated that on the day of the incident, she was arguing with Lopez, and he went to go get a beer with appellant, who she knew as "J-Cat." When they came back, Lopez was angry, and appellant was pale. Appellant said they got into it with a "buster," and he shot him.

Maya said appellant explained he and Lopez went to the gas station to get a beer, but he stayed outside because two guys (Salciedo and Phillips), who were near a woman in a Tahoe, were "talking s[***]," and Phillips was asking them "where [they were] from." After Lopez came back out of the gas station store, one of the other guys, who Maya believed was Salciedo, threw the first punch and missed, and Lopez started "going off" and fighting them. At one point, Phillips pulled out a knife; according to appellant it was "pretty big," and he got scared. Appellant said he then pulled out a gun; Lopez tried to smack it out of his hand, but appellant just started shooting. Appellant told Maya, "I don't know why I did it. I don't know why I did it. I just seen the knife. I don't know why I did it."

Maya said she believed appellant still had the gun with him when they got back to her apartment. After hearing what happened, Maya pushed appellant out of the house, and he left. A few days later, Lopez went "MIA" after the police went to his apartment and remained so at the time of the interview.

Maya stated that prior to the shooting, she had been hearing about Salciedo for a while, and he went "around in his bike taunting people in the neighborhood, asking for problems." Maya told Detective Mayo appellant and Lopez were both Bulldog gang members and that she could get killed for "snitching" on appellant. Maya further stated Salciedo must have been a Bulldog "dropout," but normally dropouts only got beat up, not shot.

At trial, Maya identified appellant, who she knew as "J-Cat," but stated she did not know anything about him and had only seen him once or twice. She further testified she knew nothing about Salciedo, and she was high on drugs during the interview that was

6.

played for the jury. She stated Lopez is a Bulldog gang member, but she did not know anything about appellant's background. After viewing photos of Salciedo, she stated that because he had a bulldog tattoo, "obviously he's a gang member." The night of the incident, she heard the doorbell ring then went to the bathroom to get high and stayed there because she did not want to deal with anyone.

Michael Chambliss, the forensic pathologist who performed Salciedo's autopsy, testified there were no gunshot wounds to the front of Salciedo's body and five gunshot injuries on the back of his body—two gunshot wounds and three graze wounds. One of the gunshot wounds started from the left back and went through the shoulder blade, with the bullet lodging in the muscles on the right back of the neck, and the other entered just above the left buttock that continued all across the left side of the body hitting major organs with the bullet coming out through the right upper chest. Chambliss determined the latter to be the cause of death. Salciedo also had abrasions on the front of his body consistent with a fall. The path of the fatal bullet was consistent with Salciedo running away from the shooter.

The firearm used for the shooting was never recovered. Detective Mayo, however, determined that it was likely a revolver since there were no expended cartridge cases, and no witnesses saw the shooter pick up any cartridge cases.

A search warrant was executed at appellant's home. In appellant's bedroom, police observed a box of .38 caliber ammunition, a glass bowl with six expended .38 caliber shell casings and one live nine millimeter round, and a live .38 caliber bullet located in a rubber boot in appellant's closet.

Jessica Winn, assistant laboratory director for the California Department of Justice Bureau of Forensic Services Fresno Crime Lab, testified that she conducted testing in appellant's case. She was provided one bullet, purported to be the bullet found in Salciedo's body, and seven cartridge cases, purported to be the casings found in appellant's bedroom. She determined the bullet was most likely fired from either a

7.

.38 special revolver or a .357 magnum revolver and that it was Remington brand. The seven cartridge cases were also most likely fired from a .38 special revolver or a .357 magnum revolver and they also "shared class characteristics, so all their features were similar." She was not able to determine whether the bullets came from the same gun; she was unable to do that comparison because she did not have a gun to do a comparison with.

In addition to a Facebook video posted on the day of the incident showing appellant and Lopez together, the prosecution also presented evidence that on July 27, 2019, Lopez "unfriended" appellant and deleted his Facebook account; on July 28, 2019, appellant posted a photo of him displaying his middle finger with a zipper mouth emoji; and on July 31, 2019, appellant posted an image with text reading, "Have you found your ride or die friend? 145%. Juan + Gilbert. You may be crazy, but at least you can be crazy together."

Appellant entered into evidence a stipulation by the parties that he did not have any tattoos.

A woman who had known appellant since he was three or four years old testified that he never had any disciplinary problems and she had never seen him use violence.

## DISCUSSION

### I.     Issues Regarding Phillips's Testimony

#### A.     *Relevant Background*

Phillips was the first witness called by the prosecution. He testified that on July 23, 2019, he was behind the gas station hanging out with Salciedo, who was like a brother to him. He said Salciedo was dropped off by his ex-girlfriend after getting into a fight with her. When asked whether the ex-girlfriend left the area after dropping Salciedo off, Phillips responded that she "tried to." When asked to give further clarification on that answer, Phillips responded, "I can't answer any further than that. That's the most I'll be able to answer." The prosecutor then asked what Phillips was doing with Salciedo,

8.

and he responded, "We were walking back to my other friends that were over there in the area." This exchange followed:

> "[PROSECUTOR:] And at some point in time did you see anyone else approach you in the parking lot?
>
> "[PHILLIPS:] I'm not going to answer any further.
>
> "[PROSECUTOR:] Okay. And when you say you're not going to answer any further, um, why are you refusing to testify at this point?
>
> "[PHILLIPS:] Because the lifestyle that I live.
>
> "[PROSECUTOR:] And what lifestyle is that?
>
> "[PHILLIPS:] Dumb.
>
> "[PROSECUTOR:] I'm sorry, dumb?
>
> "[PHILLIPS:] Yeah.
>
> "[PROSECUTOR:] Okay. Can you be more specific?
>
> "[PHILLIPS:] No.
>
> "[PROSECUTOR:] Are you a gang member?
>
> "[PHILLIPS:] Yes.
>
> "[PROSECUTOR:] And on July 23rd of 2019, were you a gang member?
>
> "[PHILLIPS:] Yeah."

The prosecutor asked Phillips what would happen to him if he were to testify in the case. Defense counsel objected on the ground of relevance, and the court overruled the objection stating, "Goes to credibility." Phillips responded, "I'm not going to answer that." The prosecutor asked Phillips if he recognized appellant, and Phillips responded by shaking his head and then stating "No." The prosecutor then asked, "No, you don't

recognize him or no you're not willing to testify?" to which Phillips responded, "I'm not going to testify."

The prosecutor then showed Phillips a photograph of Salciedo, who Phillips positively identified and testified looked the same on July 23, 2019.

The following exchange then took place:

"[PROSECUTOR:]     Mr. Phillips, what happened to [Salciedo] on July 23rd of 2019?

"[PHILLIPS]:     I'm not going to testify.

"[PROSECUTOR:]     Do you know the person seated here [appellant]?

"[PHILLIPS:]     No.

"[PROSECUTOR:]     No, you don't know him or no you're not going to testify?

"[PHILLIPS:]     No, I don't know him. No, I don't know him.

"[PROSECUTOR:]     Was he there in the parking lot on July 23rd 2019?

"[PHILLIPS:]     I'm not going to testify.

"[PROSECUTOR:]     Did you pull out a knife and threaten anyone on July 23rd of 2019?

"[PHILLIPS:]     No.

"[PROSECUTOR:]     Was there anyone else with you in that parking lot when this happened to [Salciedo]?

"[PHILLIPS:]     I'm not going to testify."

Phillips then testified he had sustained a robbery conviction in 2019 after the incident and also had a prior fraud conviction from 2016. He further testified he had

gained weight since the incident because he stopped using methamphetamine and was currently in a program.

The prosecutor then asked Phillips why he was refusing to testify about what happened to Salciedo, to which he responded, "Because I choose not to." When asked why, he responded, "Because of the lifestyle I live." The prosecutor then asked, "And just so we understand, what would it mean—based on your lifestyle, what would it mean if you testified against somebody in a court.?" Defense counsel objected as "Asked and answered," which the court overruled, and Phillips responded, "Put my life in danger." Defense counsel then objected under Evidence Code section 352, and the court responded, "The Court will now do the evaluation—the balancing test under 352, and the Court finds that the probative value is not substantially outweighed by the prejudicial effect, by the undue consumption of time, or by any risk of confusing the jury. The objection's overruled. Answer stands." The prosecutor had no further questions.

The cross-examination in substantive part went as follows:

> "[DEFENSE COUNSEL:] Back in July of 2019, after [Salciedo] died, you were transported down to Community Regional Medical Center by Detective Mayo here to look at a potential suspect; right?
>
> "[PHILLIPS:] I'm not going to testify.
>
> "[DEFENSE COUNSEL:] All right. Sir, no amount of questioning you is going to make you change your mind on your willingness to testify; right?
>
> "[PHILLIPS:] No, sir."

Defense counsel posed no further questions, and Phillips was excused.

At the first recess following Phillips's testimony, appellant moved to strike the entirety of the testimony "based upon Crawford,[6] the inability to cross-examine."[7] The

---

**6**    *Crawford v. Washington* (2004) 541 U.S. 36.

**7**    Appellant's counsel referenced "impeachment material that I'm not able to get to" and later represented, "The specific thing I'm concerned about was, at one point,

prosecutor responded that both she and defense counsel had the ability to question and cross-examine and "because [Phillips] refused, that doesn't then cause Crawford to go into effect based on the fact that the jury all saw this occur in front of us, so we would ask that the testimony remain." Defense counsel further explained that the questioning regarding Phillips's fear of testifying was more prejudicial than probative in that "it's creating this sort of ooh aura that I have no way to cross-examine." The court overruled appellant's objection and ruled that the testimony would stand.

## B.    *Denial of Motion to Strike Phillips's Testimony*

### 1.    **Alleged Abuse of Discretion**

On appeal, appellant contends the court erred by denying his motion to strike because Phillips declined to answer questions on cross-examination. We conclude the court did not err by declining to strike Phillips's testimony.

Where a party is deprived of the benefits of cross-examination of a witness by refusal of the witness to answer, the trial court may strike out the direct examination. (See *People v. Price* (1991) 1 Cal.4th 324, 421; *Fost v. Superior Court* (2000) 80 Cal.App.4th 724, 735.) "The decision whether to strike the direct examination, or a partial strike of the testimony, of a witness who does not submit to cross-examination is left to the discretion of the trial court." (*People v. Noriega* (2015) 237 Cal.App.4th 991, 1001.)

The cases on which appellant premises his argument do not persuade us that the court abused its discretion. Appellant asserts *Gallaher v. Superior Court* (1980)

---

Mr. Phillips—and this is based upon my reading of the police reports, Your Honor, Mr. Phillips is not testifying to it, but in the reports, Mr. Phillips went to CRMC, and he identified an individual by the name of Strotter Nunez as the shooter, and I can't get to that." The prosecutor responded, "That's not true," and later explained that Phillips said, " 'He didn't do nothing. He didn't do the shooting" in reference to "Strotter Nunez" to which appellant's counsel said, "Well, Detective Mayo wrote the report. I'll defer to Detective Mayo. If I misread it, I misread it, but there was this scenario where he was prevented—presented with an individual as a potential shooter, and I couldn't get to it."

12.

103 Cal.App.3d 666 (*Gallaher*) is "on point." In *Gallaher*, the prosecutor represented at the commencement of the preliminary hearing that it would be calling a witness "*only* as to facts 'leading up to the shooting' and a statement immediately thereafter made by [the defendant], after which '[the witness] is going to take the Fifth.' " (*Id*. at p. 669.) In accordance with this procedure, on direct examination, the witness implicated the defendant as the shooter. (*Id*. at p. 670.) Defense counsel cross-examined on those events, but in response to a question regarding the events after the shooting, the magistrate sustained an objection that the question was beyond the scope of direct examination. (*Gallaher*, at p. 670.) The magistrate stated the ruling that the question exceeded the scope of the direct examination "would apply to all matters chronologically following the 'shooting.' " (*Ibid*.)

The *Gallaher* court concluded, "The magistrate erred, first in accepting the arrangement worked out by the prosecutor, [the witness], and [the witness's] attorney, and secondly in denying [the defendant's] motion to strike [the witness's] direct examination. The error was of constitutional import and was patently prejudicial." (*Gallaher*, *supra*, 103 Cal.App.3d at p. 674.) The *Gallaher* court based its conclusion on the rule that "when a prosecution witness testifies to facts tending to establish the guilt of one criminally accused, that witness may be cross-examined on *all* relevant and material matters preceding, concurring with, or following the criminal event, within his knowledge and reasonably related to the issue of guilt or innocence." (*Id*. at p. 672.)

Appellant also relies on *People v. Manchetti* (1946) 29 Cal.2d 452 (*Manchetti*). In *Manchetti*, a prosecution witness testified on direct examination "with considerable hesitance although he was permitted to refresh his recollection by reading a transcript of his testimony before the grand jury" and made some incriminating statements about the defendant. (*Id*. at p. 459.) When confronted with his testimony before the grand jury on cross-examination, the witness became confused, said he did not remember and requested to be excused, explaining he was "shell-shocked." (*Id*. at p. 460.) Defense counsel told

13.

the court he did not object, and the court excused the witness. (*Ibid*.) Another attorney for the defense later asked that the witness be recalled for cross-examination, to which the court said, "I have completely excused that witness…. [Other defense counsel] cross-examined…. That witness was a shell-shocked soldier, who should not have testified." (*Ibid*.) Defense counsel moved to strike the witness's testimony, and the court denied the motion. (*Ibid*.)

The *Manchetti* court held the court's denial was an abuse of discretion. (*Manchetti*, *supra*, 29 Cal.2d at p. 462.) The appellate court noted the trial court's assertion that the other counsel cross-examined was "not, in a reasonable and full measure construction of the term, supported by the record." (*Id*. at p. 461.) Because of the circumstances before it—where the attorney who conducted the cross-examination had been required to represent the defendant with less than a day to familiarize himself with the case and therefore did not know the importance of the witness's testimony—the court's "failure even to attempt to secure to [the] defendant his right of adequate cross-examination was an abuse of discretion." (*Id*. at p. 462.)

Unlike the cases cited by appellant, Phillips did not expressly implicate appellant in criminal behavior and then refuse to be cross-examined on that testimony or prior statements. Rather, he testified he did not recognize appellant and would not testify because he was in a gang. We reject appellant's contention that by testifying his life would be in danger in response to the prosecutor's question regarding what would happen if he were to testify "against somebody" in court, Phillips invited an inference that appellant was guilty. In our view, Phillips gave the impression that he was simply unwilling to give any testimony he viewed, by his standards, as inappropriate, which appeared to include, testimony "against" anyone, not appellant specifically. Phillips's refusal to answer defense counsel's question about identifying a different suspect supports this interpretation. Defense counsel could have attempted to question Phillips more on the reasons for his refusal to testify but chose not to, and the trial court did not

do anything to prevent defense counsel from attempting to ask such questions, like the trial court did in both *Gallaher* and *Manchetti*. Because defense counsel chose not to, the trial court could not reasonably determine Phillips was refusing to be cross-examined on the statement appellant now asserts on appeal was tantamount to testimony on appellant's guilt.

The court's denial of appellant's motion to strike was not an abuse of discretion.

### 2. Alleged Sixth Amendment Violation

Appellant further contends his Sixth Amendment right to confrontation was violated by what he characterizes as Phillips's refusal to submit to cross-examination. We conclude appellant has not shown a constitutional violation.

We review de novo claims under the Confrontation Clause; we defer to the trial court's determination of "the historical facts"—which "will rarely be in dispute"—but not the court's "application of [the] objective, constitutionally based legal test to [those] historical facts." (*People v. Cromer* (2001) 24 Cal.4th 889, 896–897, 900.)

"The Confrontation Clause of the Sixth Amendment gives the accused the right 'to be confronted with the witnesses against him.' " (*United States v. Owens* (1988) 484 U.S. 554, 557 (*Owens*).) "This has long been read as securing an adequate opportunity to cross-examine adverse witnesses." (*Id*. at p. 557.) The Confrontation Clause does not entitle defendants to " ' "cross-examination that is effective in whatever way, and to whatever extent, [they] might wish." ' " (*Owens*, at p. 559.) It " 'includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.' " (*Id*. at p. 558.)

"A defendant's 'opportunity [to cross-examine] may be denied if a witness refuses to answer questions….' [Citation.] Several decisions have held that the right to cross-

15.

examination is violated where a prosecution witness refuses to answer almost all of the questions posed at trial. [Citations.] On the other hand, a witness's 'refusal to answer [defense] counsel's questions' does not violate the confrontation clause, even if it ' "narrow[s] the practical scope of cross-examination," ' so long as the jury has ' "the opportunity to assess [the witness's] demeanor and whether any credibility should be given to [his or her] testimony or … prior statements." ' " (*People v. Giron-Chamul* (2016) 245 Cal.App.4th 932, 965–966 (*Giron-Chamul*).)

Appellant relies on *Giron-Chamul*; this case does not assist appellant and is instead instructive as to why his claim should be rejected. In *Giron-Chamul*, the defendant was convicted of sex offenses against his four-year-old daughter. The Court of Appeal reversed, holding the victim's testimony should have been stricken because the defendant "was denied an opportunity to effectively cross-examine [the victim] because she did not answer hundreds of questions posed by his trial counsel" in violation of the Confrontation Clause. (*Giron-Chamul*, *supra*, 245 Cal.App.4th at p. 936.) On direct examination, the victim was often uncooperative but eventually gave incriminating testimony. On cross-examination, however, the victim was virtually always uncooperative and only answered a few of defense counsel's questions. (*Id*. at pp. 947–953.)

Notably, the court in *Giron-Chamul* expressly distinguished the case before it from a scenario in which "the defendant had an opportunity for cross-examination but chose to forgo it as a matter of strategy. (Cf. *State v. Nyhammer* (2009) 197 N.J. 383 [no record on which to decide whether confrontation clause violated because defense counsel chose not to cross-examine child on her accusations after she was unresponsive on direct].)" (*Giron-Chamul*, *supra*, 245 Cal.App.4th at pp. 964–965.) As explained by the New Jersey Supreme Court in *State v. Nyhammer*: "That counsel decided to forgo critical cross-examination because of [the witness's] unresponsiveness to many questions on direct does not mean that [the] defendant was denied the opportunity for cross-

16.

examination…. [Citation.] We cannot presume that [the witness] would have remained silent or unresponsive to questions defense counsel never asked. [Citation.] [¶] We do not fault defense counsel for not pursuing cross-examination that may have damaged [the] defendant's case. Having chosen that strategic course, however, [the] defendant cannot now claim that he was denied the opportunity for cross-examination. Quite simply, [the] defendant has not made out the fundament for a constitutional challenge under the Confrontation Clause of … the Sixth Amendment." (*State v. Nyhammer*, at p. 414.)

Here, defense counsel attempted to ask one question regarding a potential identification of another subject as the shooter, which Phillips refused to answer. He then asked Phillips if any amount of questioning would change his mind, to which he responded it would not. In our view, this exchange does not "ma[k]e out the fundament for a constitutional challenge" under the Confrontation Clause (*State v. Nyhammer*, *supra*, 197 N.J. at p. 414), and we reject appellant's claim defense counsel "was not required to go through the motions of conducting a futile cross examination." *Giron-Chamul*, which he cites to support this claim, raises no such inference. As we have explained, the attorney in *Giron-Chamul* asked the reluctant witness in that case hundreds of questions, and on the page appellant cites, the Court of Appeal, in finding the defendant had preserved the claim, noted counsel in that case, "did all he could reasonably be expected to do, given daughter's resistance, to elicit relevant information from her." (*Giron-Chamul*, *supra*, 245 Cal.App.4th at p. 965.) In the present case, defense counsel did not attempt to question Phillips on any of the questions he did answer on direct examination or, as we mentioned above, request clarification on his answer to the prosecution on testifying "against" someone in court. This appeared to be a strategic choice to place himself in the best position to move to strike Phillips's testimony and/or to limit the possibility of eliciting any potential incriminating statements that would be harmful to appellant.

Appellant has not established a Confrontation Clause violation.

### C.  *Allowing Phillips's Testimony that Testifying Would Put His Life in Danger*

In the event we rejected his claim that Phillips's entire direct testimony should have been stricken, appellant alternatively contends the court erred by allowing Phillips, over defense objection, to testify that testifying against someone in court would "put [his] life in danger."  Appellant contends the testimony was not relevant, and the court erred in determining the testimony was more probative than prejudicial under Evidence Code section 352.  We disagree.

"No evidence is admissible except relevant evidence" (Evid. Code, § 350) and "[e]xcept as otherwise provided by statute, all relevant evidence is admissible" (*Id*., § 351).  " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id*., § 210.)

"The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  "Evidence is not inadmissible under section 352 unless the probative value is 'substantially' outweighed by the probability of a 'substantial danger' of undue prejudice or other statutory counterweights. Our high court has emphasized the word 'substantial' in section 352."  (*People v. Holford* (2012) 203 Cal.App.4th 155, 167.)

We review a trial court's determination regarding relevance of evidence for abuse of discretion.  (*People v. Oneal* (2021) 64 Cal.App.5th 581, 591.)  A trial court has broad discretion in admitting or excluding evidence, and we cannot conclude the court erred unless the court exercised its discretion in an arbitrary, capricious, or patently absurd

manner that results in a miscarriage of justice. (*People v. Streeter* (2012) 54 Cal.4th 205, 238.)

First, we conclude the trial court did not abuse its discretion by determining the testimony was relevant. " '[E]vidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. [Citations.] An explanation of the basis for the witness's fear is likewise relevant to her credibility and is well within the discretion of the trial court.' " (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1084.) "Moreover, evidence of a 'third party' threat may bear on the credibility of the witness, whether or not the threat is directly linked to the defendant." (*Ibid*.)

We further conclude the trial court did not abuse its discretion by determining the testimony was admissible under Evidence Code section 352. The undue prejudicial effect of the statement was low because Phillips did not suggest his fear was of appellant.[8] The statement did, however, explain his reluctance to testify, as we have explained, and did have probative value as to the issue of Phillips's credibility, particularly as to his few substantive contentions—that Phillips did not know or recognize appellant, as well as his claim he did not pull a knife out during the incident. By eliciting testimony that Phillips feared for his life, the prosecution could explain Phillips's testimony that he did not know appellant in light of the other evidence it presented that appellant was present at the scene.

We find no abuse of discretion.

---

[8]     Appellant acknowledges this, stating in his briefing, "Because Phillips knew nothing about [appellant], [Phillips's] fear of giving testimony could not be attributable to appellant or anyone associated with him…. The only inference that can be drawn was that [Phillips] feared retribution from his own gang, were he to aid law enforcement by testifying for the prosecution against someone, which would be considered snitching."

## II.	Admission of Alleged Improper Lay Opinions on Appellant's Guilt

"If a witness is not testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is permitted by law, including but not limited to an opinion that is: [¶] (a) Rationally based on the perception of the witness; and [¶] (b) Helpful to a clear understanding of his testimony." (Evid. Code, § 800.) "The court may, and upon objection shall, exclude testimony in the form of an opinion that is based in whole or in significant part on matter that is not a proper basis for such an opinion. In such case, the witness may, if there remains a proper basis for his opinion, then state his opinion after excluding from consideration the matter determined to be improper." (*Id.*, § 803.) "Testimony in the form of an opinion that is otherwise admissible is not objectionable because it embraces the ultimate issue to be decided by the trier of fact." (*Id.*, § 805.)

"A witness may not express an opinion on a defendant's guilt." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 77.) "The reason for this rule is not because guilt is the ultimate issue of fact for the jury, as opinion testimony often goes to the ultimate issue." (*Ibid.*) " 'Rather, opinions on guilt or innocence are inadmissible because they are of no assistance to the trier of fact. To put it another way, the trier of fact is as competent as the witness to weigh the evidence and draw a conclusion on the issue of guilt.' " (*Ibid.*)

"We review for an abuse of discretion a trial court's ruling that a question calls for speculation from a witness." (*People v. Thornton* (2007) 41 Cal.4th 391, 429.)

Appellant contends Ankenman and Detective Mayo testified to improper opinions on his guilt. We need not reach the merits of appellant's contentions because we conclude any error in allowing the challenged testimony by these witnesses was clearly harmless. Under the *Watson*[9] standard, erroneous admission of evidence constitutes reversible error "only if a reasonable probability exists that the jury would have reached a

---

[9]	*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).

different result had this evidence been excluded." (*People v. Whitson* (1998) 17 Cal.4th 229, 251.)

### A.    *Ankenman*

As to Ankenman, appellant contends he gave an improper opinion by, responding to the prosecutor's question regarding a still from the gas station security footage, "Do you recall identifying one of these individuals to Detective Mayo as the person that you believe was the shooter?" by saying, "Yes, I believe it was the person on the left, wearing the, it looks like a grey-ish/white shirt" and clarifying the "taller individual." The court overruled defense counsel's objection to the question as "Leading. Speculation. Vague." On appeal, appellant points out Ankenman did not see the shooting and therefore "there was no foundation of personal knowledge for him to opine as to who it may have been."[10] [11]

Assuming error, we conclude there is not a reasonable probability of a different result had Ankenman's testimony that he believed appellant was the shooter been excluded. First, Ankenman testified as to his observations that supported his opinion that

---

[10]    Appellant also points out that the court had sustained defense counsel's objection to the previous question asked by the prosecutor that it called for speculation and lacked foundation: "Okay. And, um, is there an individual in this photograph that you believed to be the shooter?"

Appellant further points out that the court sustained a similar objection from earlier in Ankenman's testimony. When asked if he saw who fired the gun, Ankenman said, "I couldn't see, but it seemed to me like, um, because of the noise, and I don't know if that means anything, but the noise, like I said, I got a quick glimpse of the people standing there before they took off running, but it seemed to be like the taller gentleman." The prosecutor asked, "You believe the taller gentleman was the shooter?" to which Ankenman responded, "I believe so, but I'm not entirely accurate." Defense counsel objected on the ground of speculation, and the court sustained the objection and granted defense counsel's motion to strike.

[11]    Respondent contends appellant forfeited his challenge to Ankenman's testimony by not objecting to it as "improper opinion." We disagree with respondent; appellant's objection that the question called for speculation was sufficient to preserve the issue for appeal.

appellant was the shooter. He testified that after the shooting, appellant was staring directly at Salciedo, appeared to run more frantically than the other individual, and appeared to have something in his hand, though he was not sure what it was and may have been a hat. The jury knew Ankenman did not see the shooting and could evaluate his opinion based upon the observations he testified to and give it the weight to which they felt it was entitled.

In addition, though Ankenman positively identified appellant as the shooter, his identification was weak compared to Odeh's eyewitness account of the shooting and Maya's statements to Detective Mayo that appellant admitted to the shooting. We reject appellant's repeated claim throughout his briefing that the evidence identifying appellant as the shooter was "weak and conflicting." We acknowledge appellant's point that the witnesses could be described at times as being inconsistent in describing appellant and Lopez's clothing. In reviewing the totality of the evidence, however, the evidence supporting that appellant was the shooter was strong. While Odeh wavered between whether the shooter's shirt was grey or beige or even black, she was consistent and emphatic about key factors consistent with appellant. She stated the shooter was the younger of the two, with a rounder face, wearing the lighter color clothing and not wearing a hat—all of which the jury could have confirmed from the visual evidence presented in the case reasonably described appellant. Barajas's testimony that both suspects were bald and shirtless, in light of the other evidence placing appellant and Lopez at the scene, was so clearly unpersuasive that it cannot be said to have raised any doubt in the minds of jurors that appellant was the shooter.

In addition to Odeh's compelling identification, Maya told Detective Mayo appellant admitted to her that he was the shooter. While appellant argues Maya's statement to Detective Mayo was not credible based on her presumed loyalty to Lopez and her assertion at trial that she was high while making the statement and that it was not true, it does not follow that Maya would not continue to implicate appellant at trial if her

goal was to protect Lopez. We also note Maya stated that appellant waited outside while Lopez went into the gas station in the moments before the shooting. This seemingly minor detail is corroborated by the security footage and adds reliability to Maya's statement and tends to subvert appellant's claim that she may have attributed details Lopez gave her about his doing the shooting to appellant. Finally, the evidence found in appellant's bedroom also ties him to the shooting.

In sum, it is not reasonably probable that the jury would have reached a different result had the challenged portion of Ankenman's testimony not been admitted, and thus, we conclude any error was harmless.

### B.      Detective Mayo

During the prosecutor's redirect examination of Detective Mayo she asked, "[Defense counsel] asked you if your main focus was to get a lead on Gilbert Lopez when you were speaking to Jeanette Maya, and you said that was one of the focuses. What was the other focus?" Detective Mayo responded, "Part of the reason I wanted to contact the people that lived at that location and also to speak with Gilbert is to identify the second person in the Arco video. This is a person I believed to be the shooter." Defense counsel objected "to the last portion as improper opinion," which the trial court overruled. The prosecutor went on: "So because you only had the name of Gilbert Lopez, um, you weren't able, at that time, to seek to arrest the person you believed to be the shooter?" Detective Mayo responded, "Correct, I needed more information."

Appellant contends Detective Mayo's statement was an improper opinion on the issue of appellant's guilt. As with Ankenman, we conclude there is not a reasonable probability of a different result had Detective Mayo's challenged statement that she believed appellant was the shooter been excluded.

Evidence that went unchallenged was admitted showing that during the investigation, at the time of Maya's recorded interview, Detective Mayo believed appellant to be the shooter. During the interview, which appellant stipulated would be

23.

admitted at trial, Detective Mayo stated she did not believe Lopez was the shooter. Later, in response to Maya saying Lopez had no reason to run, Detective Mayo responded, "He really does not" and that Lopez "needs to come and just clear his name." Thus, even if Detective Mayo's testimony were to be stricken, the jury would still have heard in the interview that Detective Mayo believed appellant was the shooter, and there was no testimony or evidence that Detective Mayo lied to Maya or used a ruse during her interview with Maya regarding that statement.[12]

Similarly, like with Ankenman's testimony, the source of Detective Mayo's belief was presented to the jury, giving them the opportunity to weigh the testimony based on the evidence. Detective Mayo's assertion that she believed appellant was the shooter occurred at the point of the investigation when she spoke to Maya, which occurred on

---

[12] Though we conclude the error was clearly harmless for this reason, we address a case appellant cites in his reply brief—*People v. Rouston* (2024) 99 Cal.App.5th 997. In *Rouston*, an attempted murder case, the appellate court found error where a detective, the prosecution's gang expert and designated investigator, was asked " 'based on the witness testimony' " who he believed the shooter was, and the detective, over objection stated he believed it was the defendant. (*Id*. at p. 1012.) The *Rouston* court found reversible error in part because " 'the jury had every reason to look to [the detective] as a far better judge than they could be' regarding the reliability of other witnesses' testimony, and what inferences to draw from the prosecution's other evidence. [Citation.]" (*Ibid.*) The court concluded the trial court's allowance of the detective's testimony was an abuse of discretion because it "usurped the jury's role." (*Ibid*.) The court found the error prejudicial under *Watson* because the opinion "bolstered the witness testimony that favored the prosecution and minimized the inconsistencies in that evidence." (*Rouston*, at p. 1018.)

*Rouston* is factually distinguishable. In *Rouston*, the detective's opinion that the defendant was the shooter was given in response to a direct question essentially asking the detective to evaluate the evidence presented at trial. In the present case, Detective Mayo's statement that appellant was who she believed to be the shooter, was offered to explain actions taken in her investigation of the case. We do not believe the jury would have put as much weight on this statement as it would have put on the testimony given in *Rouston* given the different contexts in which the statements were made.

We note that to the extent *Rouston*'s reasoning disregards Evidence Code section 805 and *People v. Coffman and Marlow*, *supra*, 34 Cal.4th at page 77, principles discussed in the body of this opinion, we respectfully disagree.

August 22, 2019. By the time Detective Mayo interviewed Maya on August 22, 2019, Odeh had identified appellant in the security video still on August 2, 2019, and the search warrant had been executed at appellant's residence on August 15, 2019.

Moreover, this distinguishes the present case from *People v. Arends* (1957) 155 Cal.App.2d 496 (*Arends*), on which appellant relies to support his claim the error was prejudicial. In *Arends*, the appellate court found error where a deputy district attorney testified he believed at the outset of the case that the defendant was guilty based on his "examination of the file," his "talks with [the defendant]" and his "talks with the investigators." (*Id*. at p. 507.) The appellate court reasoned that the witness's belief was based at least in part on facts not presented to the jury and was therefore improper. (*Id*. at p. 510.) Here, in contrast, the jury had no reason to believe Detective Mayo's opinion was in any way based on information not presented to it.

Any error in allowing Detective Mayo's testimony that during her investigation she believed appellant was the shooter was harmless.

### III. Failure to Give CALCRIM No. 332 on Evaluating Expert Opinion

Appellant contends the failure to instruct the jury with CALCRIM No. 332 on evaluating expert opinion was error because two experts testified at the trial, the forensic pathologist who conducted the autopsy—Chambliss—and the DOJ assistant laboratory director—Winn. Chambliss opined that the fatal wound was consistent with someone running away. Winn opined the bullet she examined was most likely fired from a .38 special revolver or a .357 magnum revolver and was most likely a Remington brand bullet.

Respondent concedes error as to Chambliss only but contends it was harmless. As to Winn, respondent asserts she did not testify as an expert.

We need not resolve the dispute as to whether Winn testified as an expert. Assuming she did, we conclude that as to both Chambliss and Winn, any error in failing to give CALCRIM No. 332 was harmless.

25.

When expert testimony is received in a criminal proceeding, section 1127b[13] requires the trial court provide an instruction sua sponte regarding the evaluation of such testimony.

CALCRIM No. 332 provides in relevant part:

> "(A witness was/Witnesses were) allowed to testify as [an] expert[s] and to give [an] opinion[s]. You must consider the opinion[s], but you are not required to accept (it/them) as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether information on which the expert relied was true and accurate. [¶] You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

We assess the failure to give CALCRIM No. 332 under the *Watson* standard. (*People v. Reeder* (1976) 65 Cal.App.3d 235, 241, 243, citing *Watson*, *supra*, 46 Cal.2d at p. 836.) The test is whether "it is reasonably probable that a result more favorable to [the] defendant would have occurred had the instruction required by Penal Code section 1127b been given." (*Reeder*, at p. 243.) Probability under *Watson* "does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility." (*People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 918.)

---

[13]    Section 1127b provides:

"When, in any criminal trial or proceeding, the opinion of any expert witness is received in evidence, the court shall instruct the jury substantially as follows:

"Duly qualified experts may give their opinions on questions in controversy at a trial. To assist the jury in deciding such questions, the jury may consider the opinion with the reasons stated therefor, if any, by the expert who gives the opinion. The jury is not bound to accept the opinion of any expert as conclusive, but should give to it the weight to which they shall find it to be entitled. The jury may, however, disregard any such opinion, if it shall be found by them to be unreasonable.

"No further instruction on the subject of opinion evidence need be given."

Here, any error was harmless. Though the jury was not given CALCRIM No. 332, other instructions they were given properly assisted them in evaluating Chambliss's and Winn's testimony. The jurors were instructed they "must decide what the facts are," and "[i]t is up to all of you, and you alone, to decide what happened, based only on the evidence that has been presented to you in this trial." (CALCRIM No. 200.) The jurors were further instructed with CALCRIM No. 226, which provides, "You alone must judge the credibility or believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have." The instruction further provided: "You may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe." The jurors were instructed they "may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony" and were provided with the general factors to be considered in evaluating a witness's testimony. The jury was also instructed that "[t]he testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence." (CALCRIM No. 301.)

Together, these instructions substantially covered the matters required by section 1127b and CALCRIM No. 332 and sufficiently informed the jury how to evaluate the witness's testimony. We presume the jury followed these instructions. (*People v. Case* (2018) 5 Cal.5th 1, 32.)

Appellant emphasizes that CALCRIM No. 332 instructs the jury that they should consider the "expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion," factors not covered by CALCRIM No. 226 or any other instruction. Appellant contends this omission was particularly prejudicial with regard to Winn's testimony because her opinion was "particularly sketchy." Appellant claims

Winn's "expertise in ammunition identification was not clearly demonstrated." However, we cannot say specific instruction on considering an expert's training and experience would have had an impact on the jury's evaluation of Winn's testimony and/or their verdict. Appellant did not challenge her expertise in this area[14] or her identification of the bullet as Remington brand. Appellant's concern that the bullet was not adequately tied to the bullet found in Salciedo's body during the autopsy, does not go to the jury's evaluation of Winn as an expert, but rather to the relevance of the line of questioning on the particular bullet, something appellant did not object to during trial, and does not raise on appeal.

Similarly, Chambliss's ability to make opinions about the potential causes of a particular bullet trajectory was not questioned. Rather, defense counsel elicited testimony from Chambliss that there were other possible reasons for the bullet trajectory, including that Salciedo was on the ground at the time he was shot or standing still. That is to say, defense counsel relied on Chambliss's ability to make such opinions and somewhat neutralized Chambliss's opinion that the trajectory was consistent with Salciedo running away.

In sum, it is not reasonably probable appellant would have received a more favorable outcome had CALCRIM No. 332 been given to the jury. As such, any error was harmless.

## IV. Alleged Due Process Violation by Court's Comments on the Term "Victim"

During Maya's testimony, the prosecutor asked the question, "If you could just look at the tattoos of the victim, and based on your experience, do you know what gang the victim was in?" Defense counsel objected "to the form of the question as argumentative, 'Victim.' " The court stated,

---

[14] To the contrary, defense counsel referred to her as "the real life CSI," and twice during cross-examination while asking her a question on ammunition prefaced the question with "as an expert."

"Um, as far as that goes, ladies and gentlemen, ultimately, you will be—no, no, no, no. Um, this person is deceased. He's laying on the asphalt. He's been shot. He's a victim. Okay. So the objection's overruled."

Appellant contends the trial court's comment amounted to a due process violation because it "eliminated or reduced the People's burden of proving an element of murder (unlawful killing) as well as the People's burden to disprove lawful self-defense." Respondent does not address appellant's claim of error at length but rather focuses its discussion on its assertion that any error was harmless under any standard. We reject appellant's assertion that the court's comments regarding the prosecutor's use of the term victim was a due process violation.

Appellant's claim is based on *People v. Williams* (1860) 17 Cal. 142 (*Williams*). In *Williams*, the Supreme Court cautioned that a trial court in a homicide case should not refer to the deceased person as a " 'victim.' " (*Id*. at pp. 146–148.) The court explained that using the word "victim" while instructing the jury "seems to assume that the deceased was wrongfully killed when the very issue was as to the character of the killing." (*Id*. at p. 147.) The court noted that "*in a case of conflicting proofs*, even an equivocal expression coming from the Judge, *may be* fatal to the prisoner." (*Ibid*., italics added.) The court reversed the conviction, however, based on a different claim of error and did not address whether it was reversible error to use the term "victim" in that particular case and, by its language, suggested it was amenable to harmless error analysis. (*Id*. at p. 148.) Notably, not *Williams* nor any of the cases appellant cites characterizes the court's use of the word victim as a due process violation or an error of constitutional proportion.

We reject appellant's contention that the jury would have understood the court's comments as reducing the burden of proof such that the court's comments resulted in a due process violation. Though appellant characterizes the court's comments as an admonition to the jury akin to a formal instruction, an assertion we accept for the sake of argument, the court's comments did not directly address the prosecution's burden of

proof. Other instructions, on the other hand, did directly and thoroughly instruct the jury that the prosecution had the burden to prove the killing was unjustified. (CALCRIM Nos. 220, 520, 505.) Further, the jury was also instructed at the beginning and end of the trial, that they were not to take anything the court said or did during the trial as an indication of "what I think about the facts, the witnesses, or what your verdict should be." (CALCRIM Nos. 101, 3550.) In light of these instructions, it is not possible the jury construed the court's comments as reducing the prosecution's burden of proof. Because of this conclusion, we reject that appellant's contention is subject to *Chapman*[15] review.

Rather, we conclude that any error resulting from the court's comments did not constitute reversible error because there is no reasonable likelihood the jury would have reached a different result if the court had not made such a comment. (See *People v. Prieto* (2003) 30 Cal.4th 226, 249 [erroneous instruction concluded by court not to have lowered the prosecution's burden of proof analyzed under *Watson* reasonable likelihood standard].) We agree with respondent that, in context, the jury would have understood the term "victim" to mean "the person who was killed," or, in other words, the victim of a homicide. The jury had been told by Chambliss, without objection, that the manner of death was homicide, meaning Salciedo died "at the hands of another person."

Moreover, appellant's argument that the killing was done in self-defense was weak. If the jury credited appellant's statement to Maya that Phillips pulled out a knife and he was scared for his life, it does not reasonably explain appellant's attack on Salciedo, who neither he nor any other witness claimed had a knife or any other weapon. In addition, Odeh's testimony and Chambliss's examination of Salciedo's body taken together overwhelmingly supported that Salciedo was shot in the back. It is unlikely the court's brief statement that Salciedo was a "victim" would have affected the jury's verdict in any way in light of the compelling evidence against the homicide being justified.

---

[15] *Chapman v. California* (1967) 386 U.S. 18.

We conclude the court's comments did not amount to a due process violation, and any error was harmless.

## V.      Ineffective Assistance of Counsel

Appellant contends his trial counsel provided ineffective assistance by failing to object to the following portion of the prosecutor's argument:

> "There is no proof that [Phillips] or [Salciedo] started the fight. We don't have any witnesses that say that anybody was in a physical fight on July 23rd, 2019. None of the witnesses saw anyone with a knife. There is no evidence that [appellant] was in fear for his safety. And how do we know that? We know that because witnesses, Jose Barajas, Timothy Ankenman, and Valerie Odeh, all say that Michael Salciedo was running away. Okay. So this was not a situation where there was this fist fight, and all of a sudden, Juan Miranda felt like his life was in jeopardy and he had to defend himself or defend his friend. That is not what we have here."

Appellant also asserts his trial counsel should have objected to the following portion of the prosecutor's rebuttal argument that:

> "[N]one of [defense counsel's] opinions and none of his smoke and mirrors talking about self-defense or the defense of others, none of that has been shown to you during this trial. There is absolutely no evidence of any of those things that he's talking about."

First, appellant contends the prosecutor committed misconduct by inappropriately suggesting he had the burden to prove self-defense or voluntary manslaughter by arguing there was "no" evidence supporting self-defense or voluntary manslaughter and failing to address appellant's statement to Maya that Phillips had pulled out a knife and that he was scared. Appellant also contends that by commenting there was no evidence he feared for his safety when the only source of such evidence could be appellant thereby committing error under *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*). We conclude appellant's trial counsel's failure to object to this line of argument under these grounds was not ineffective assistance because he cannot show prejudice.

To prevail on an ineffective assistance of counsel claim, appellant must establish that (1) the performance of his trial counsel fell below an objective standard of

31.

reasonableness and (2) prejudice occurred as a result, that is, there is a reasonable probability the defendant would have obtained a more favorable outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 687; *People v. Anderson* (2001) 25 Cal.4th 543, 569.) "When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) Counsel's failure to make a futile or unmeritorious objection is not deficient performance. (*People v. Price*, *supra*, 1 Cal.4th at p. 387.)

As for appellant's claim that the prosecutor's comments reversed the burden of proof, we do not find it is reasonable to conclude the jury would have interpreted the prosecutor's comments in any way as reducing the People's burden of proof, given the court's instructions, which, as we have stated above, we presume the jury followed. (*People v. Case*, *supra*, 5 Cal.5th at p. 32.) The jury was properly instructed that the People were required to prove all elements of the case beyond a reasonable doubt (CALCRIM No. 220); that the People were required to prove beyond a reasonable doubt the killing was done without lawful excuse or justification (CALCRIM Nos. 520, 505); and that the People had the burden to prove beyond a reasonable doubt that appellant did not kill as the result of a sudden quarrel or in the heat of passion, and was not acting in imperfect self-defense (CALCRIM Nos. 570, 571).

The court further instructed the jurors that if they "believe that the attorneys' comments on the law conflict with [the court's] instructions, you must follow [the

court's] instructions" (CALCRIM No. 200). The court also instructed the jurors: "Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence" (CALCRIM No. 222). Because the jury would have not understood the prosecutor's comments as reducing the burden of proof, any objection would have been futile. The court's response would likely have been to simply reiterate instructions they already received, and thus there is not a reasonable probability of a more favorable outcome had defense counsel made the objection.

We turn to appellant's claim that the prosecutor's comments were error under *Griffin*, in which the U.S. Supreme Court held a prosecutor's comment on a defendant's failure to testify violated the self-incrimination clause of the Fifth Amendment. (*Griffin*, *supra*, 380 U.S. at p. 615.)

Appellant cites *People v. Bloom* (2022) 12 Cal.5th 1008 (*Bloom*) to support the proposition that is the primary thrust of his argument: " 'While a prosecutor does not violate the *Griffin* rule by commenting on the absence of certain evidence, a *Griffin* error does occur when the only possible source of such evidence would have been the defendant.' [(*Bloom*, at p. 1055.)]"

A review of *Bloom*'s analysis undermines appellant's argument. There, our high court found "the prosecutor's comment that 'we will never know what [(the defendant) and his father] were talking about out there' … in a conversation as to which only [the defendant] evidently could have testified appear[ed] impermissible under *Griffin*." (*Bloom*, *supra*, 12 Cal.5th at pp. 1054–1055.) The *Bloom* court however found the comment "was brief and did not overtly call attention to [the defendant's] failure to take the stand at the guilt phase to explain what had occurred" and was "satisfied beyond a reasonable doubt that the prosecutor's fleeting remark could not have prejudiced [the defendant]." (*Id*. at p. 1055.)

33.

Though we find the jury would not have reasonably understood the prosecutor's comments as asking the jury to draw a negative inference from appellant's exercise of his right to remain silent, even if we were to assume the prosecutor's comments were impermissible under *Griffin*, they were, like in *Bloom*, "brief and did not overtly call attention to [appellant's] failure to take the stand." In addition, the jury was properly instructed, as stated above, that if the attorneys say anything that conflicts with the court's instructions, to follow the instructions (CALCRIM No. 200), and that appellant had "an absolute constitutional right not to testify" and the jury must not "consider, for any reason at all, the fact that the defendant did not testify," "discuss that fact during … deliberations," or "let it influence your decision in any way" (CALCRIM No. 355). We conclude any *Griffin* error was harmless beyond a reasonable doubt and thus appellant cannot show *Strickland* prejudice for failing to object on this ground.

For these reasons, we conclude appellant has not shown grounds for reversal based on his allegation of ineffective assistance of counsel.

## VI.     Alleged Lack of Informed Discretion Regarding the Firearm Enhancement

While sentencing appellant, the trial court noted that the firearm enhancement found true by the jury pursuant to section 12022.53, subdivision (d) "mandates that the defendant serve an additional and consecutive term of 25 years to life."[16]

Appellant correctly points out that when a firearm enhancement is found true or admitted by the defendant, the court is not required to impose additional punishment; rather, it may strike the enhancement in the interest of justice pursuant to section 1385, or impose a lesser uncharged statutory enhancement instead. (§ 12022.53, subd. (h); *People v. Tirado* (2022) 12 Cal.5th 688, 692 (*Tirado*).) Appellant contends that because the court

---

[16]     Appellant suggests the court was reading language in the probation report, which states the section 12022.53, subdivision (d) enhancement "mandates the defendant serve an additional and consecutive term of twenty-five years to life."

34.

stated that section 12022.53, subdivision (d) "mandates" the additional 25-years-to-life term, it did not exercise informed discretion and he is therefore entitled to resentencing.[17]

We conclude appellant has forfeited this claim on appeal. "[U]nless a party makes a contemporaneous objection, he or she generally cannot challenge a court's ruling for the first time on appeal." (*People v. McCullough* (2013) 56 Cal.4th 589, 594; see *People v. Welch* (1993) 5 Cal.4th 228, 234 ["It is settled that failure to object and make an offer of proof at the sentencing hearing concerning alleged errors or omissions in the probation report waives the claim on appeal."]; see *People v. Gonzalez* (2003) 31 Cal.4th 745, 751 ["A party in a criminal case may not, on appeal, raise 'claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices' if the party did not object to the sentence at trial."].)

Here, appellant did not object to the indication in the probation report that section 12022.53, subdivision (d) "mandates" a 25-years-to-life term or the court's statement of the same and did not request the court to strike the enhancement or impose a lesser firearm enhancement. Section 12022.53, subdivision (h) became effective in 2018 and *Tirado* was decided in January 2022; both occurred well before the January 2023 sentencing hearing in this case.

The case appellant cites in support of his contention the issue is not forfeited—*People v. Leon* (2016) 243 Cal.App.4th 1003 (*Leon*)—does not persuade us otherwise. In *Leon*, the appellate court remanded for resentencing when the sentencing court made repeated references to a case that did not apply to the case before it, as well as inaccurate statements that it did not have discretion to make a particular sentencing choice. (*Id.* at

---

**17** Appellant suggests that upon remand, the court would be required to dismiss the enhancement pursuant to section 1385 in absence of a finding that appellant endangered public safety because " 'the application of an enhancement could result in a sentence of over 20 years' " as stated in section 1385, subdivision (c)(2)(C). Respondent contends the enhancement did not "result in" a sentence of over 20 years because appellant was already sentenced to an indeterminate life sentence by way of his murder conviction. Appellant does not respond to this contention in his reply brief.

p. 1026.) The *Leon* court concluded these factors were "most reasonably interpreted as [the sentencing court's] confusion over the scope of its sentencing authority." (*Ibid*.)

The present case is distinguishable from *Leon*. Contrary to appellant's interpretation, we do not believe the trial court's comments reflected a belief that the enhancement was mandatory. Rather, the court's statement that section 12022.53, subdivision (d) "mandates" a 25-years-to-life term is most reasonably interpreted as that particular subdivision simply prescribing a 25-years-to-life term. Just because section 12022.53, subdivision (h) and *Tirado* give the court discretion not to impose the 25-years-to-life term does not change the statutory prescription if the court so chooses to impose the enhancement. We presume the court followed the law. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 398.) The court's use of the word "mandate" does not, in our view, adequately rebut that presumption. At the time of the sentencing hearing, it was well-established the law had changed to give discretion to the court to strike or impose a lesser firearm enhancement and likely had impacted many cases and sentencing hearings between their enaction and appellant's sentencing.

For the reasons set forth, we find the issue forfeited and decline to remand for resentencing.

## VII. Errors in Abstract of Judgment

Boxes in section 8 of the abstract of judgment indicate appellant was sentenced pursuant to sections 667.61 and 667.7. The parties agree these code sections do not apply, and the boxes should not be checked. Section 667.61, also known as the "One Strike" law, applies only to specified sexual offenses and section 667.7 applies to "habitual offenders."

Without further discussion, we agree with the parties that the abstract of judgment must be corrected to reflect that appellant was not sentenced pursuant to section 667.61 or 667.7. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185 [courts have inherent power to correct clerical errors].)

## DISPOSITION

The abstract of judgment is modified to reflect appellant was not sentenced pursuant to sections 667.61 and 667.7.  The trial court is directed to amend the abstract of judgment by unchecking the boxes checked in section 8 and shall cause the amended abstract of judgment to be forwarded to the appropriate authorities.  As so modified, the judgment is affirmed.


DE SANTOS, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


FRANSON, J.

37.